# No. 13,553.

Armstrong *v*. Mitten et al., Petitioners and James, Intervener.

(37 P. [2d] 757)

Decided July 2, 1934.

426

Mr. Paul P. Prosser, Attorney General, Mr. Charles Roach, First Assistant, Mr. Pierpont Fuller, Jr., Assistant, for plaintiff in error.

Mr. Samuel Chutkow, Mr. Noah A. Atler, Mr. Omar T. Mallory, Mr. Robert Schaper, for defendants in error.

Mr. James D. Parriott, Mr. Frederick P. Cranston, for intervener.

Mr. E. L. Regennitter, Mr. Clifford H. Stone, Mr. Albert L. Moses, Mr. Frank Delaney, Mr. John M. Boyle, amici curiae.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

This is a proceeding under the Declaratory Judgments Act. The petitioners sought to have an initiated measure, adopted by the people and appearing in the Session Laws of 1933 as chapter 157, declared valid, and to have a legislative act, appearing in said Session Laws as chapter 156, declared void. Both acts relate to legislative reapportionment. The trial court upheld the contention of the petitioners.

Section 45 of article 5 of the state Constitution is as follows: "The general assembly shall provide by law for an enumeration of the inhabitants of the state, in the year of our Lord 1885, and every tenth year thereafter;

and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of the United States, shall revise and adjust the apportionment for senators and representatives, on the basis of such enumeration according to ratios to be fixed by law.'' Section 47 of article 5 is as follows: ''Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district.''

The last enumeration of the inhabitants of the state was the United States census of 1930. The general assembly, which met in 1931, having failed to revise and adjust the apportionment, the people, in 1932, adopted the initiated measure referred to above. In 1933 the general assembly passed the reapportionment act already referred to.

The initiated act provides that the general assembly shall consist of 100 members, of whom 35 shall be members of the Senate and 65 members of the House of Representatives. It establishes the following ratios for the apportionment of senators and representatives: One senator for each senatorial district for the first 17,000 of population, and one additional senator for each additional 35,000, or fraction over 32,000; one representative for each representative district for the first 8,000, and one additional representative for each additional 19,000, or fraction over 17,000. It then divides the state into senatorial and representative districts, and prescribes the number of senators to which each senatorial district shall be entitled, and the number of representatives to which each representative district shall be entitled. The ratios fixed in the initiated act and in the legislative act are the same. The difference between the two acts consists in the manner in which they redistrict the state and

designate the number of senators and representatives for the several districts.

■■ 1. *The Legislative Act.*

Assuming, but not deciding, that under section 47, a general redistricting of the state may occur more frequently than once after each census, the redistricting must be done with due regard to the requirement that representation in the general assembly shall be based upon population. The legislative act in question is void because it violates section 45 of article 5 of the Constitution, which requires the reapportionment to be made on the basis of population, as disclosed by the census, and according to ratios to be fixed by law. The ratios fixed by both acts are the same, though they are effective by virtue, not of the legislative act, but of the initiated act. It is clear that ratios, after having been fixed under section 45, supra, cannot be changed until after the next census.

The legislative act attempts to confer upon some districts a representation that is greater, and upon others a representation that is less, than they are entitled to under the Constitution.

A glance at the senatorial districts reveals the following situation: According to the census and the established ratio, the Denver district is entitled to 8 senators. The legislative act gives it only 7 senators, thereby depriving it of one senator, in plain violation of the Constitution. Rio Grande, Saguache and Mineral counties are grouped together as the 15th senatorial district; and although their combined population is less than 17,000, the district is given one senator, although it would require the addition of at least one more county to give it a population sufficient to entitle the district to one senator. The same situation exists in the 18th senatorial district, which is given one senator, although the combined population of its constituent counties is less than the population sufficient to entitle the district to one sen-

ator. And the 21st senatorial district is in precisely the same situation.

Turn now to the representative districts. According to the census and the established ratio, the Denver district is entitled to 15 representatives, but the legislative act gives it only 12, thereby depriving it of 3 representatives, in plain violation of the Constitution. Hinsdale, Mineral and Archuleta counties constitute one district, which is given one representative, notwithstanding the fact that the combined population of the counties is less than that required to entitle the district to one representative. And the same is true of the district composed of Gilpin and Clear Creek counties; and of the district composed of Park and Teller counties; and of the district composed of Eagle and Pitkin counties; and of Gunnison county, which constitutes one district.

It may be noted that, in marked contrast to the legislative act, each district created by the initiated act is composed of counties having a total population sufficient to entitle the district to representation.

That part of the legislative act attempting to redistrict the state and to apportion senators and representatives to the several districts violates the Constitution, not in one instance only, but in many instances. It is so honeycombed with unconstitutional provisions as to render it void. That part of the act attempting to fix ratios is inoperative, because the ratios were fixed in the initiated act, and, when once fixed, must remain until after the next census. That part of the legislative act, however, is harmless, as it does not attempt to change the ratios fixed in the initiated act.

█ The repeal provision of the legislative act falls with the rest of the act. It was the purpose of the general assembly to repeal the initiated act so that its own reapportionment act would be an effective substitute therefor. It is clear that it did not intend the repeal to be operative except in the event that its own act should be held to be valid. The legislative act also purports to

430

repeal the apportionment act of 1913, being sections 20, 21, 22, 23, 24 and 25 of the Compiled Laws. The last reapportionment act prior to the act of 1913 was based upon the census taken in 1900—thirty-four years ago. It would be impossible to apply such a reapportionment act at the present time. New counties have been created, county boundaries have been changed, and population not only has increased but has shifted greatly. It cannot be supposed that the general assembly, even if it possessed the power to do so, intended to restore the old apportionment act, and thereby create the chaotic condition that would result. It is sufficient to say, however, that such an attempt, if made, could not succeed. The initiated act repealed the act of 1913 and all prior reapportionment acts, and a repeal of the initiated act would not revive the prior acts. C. L. §6518.

We hold that the legislative act of 1933, appearing in the Session Laws of that year as chapter 156, is unconstitutional and therefore void.

■ 2. *The Initiated Act.*

Several objections to the validity of the initiated act are presented to us for consideration.

(a) We do not agree with the contention that the people have no power to adopt an initiated reapportionment bill. In section 1 of article 2 of the state Constitution the people declare: "That all political power is vested in and derived from the people; that all government, of right, originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."

The people are sovereign. The general assembly was created by them and is merely their agent. For reasons satisfactory to them, the people, in 1910, deemed it unwise to permit their agent, the general assembly, to continue longer to exercise exclusive legislative power. They therefore amended section 1 of article 5 of the Constitution by reserving to themselves the power to make laws directly and independently of the general assembly,

and also the power to approve or reject acts passed by the general assembly. In our opinion, the reservation of power is sufficiently broad to include the power to adopt a reapportionment act.

The present instance affords an outstanding example of the necessity for the exercise of such reserved power. The members of the general assembly take a solemn oath to uphold the Constitution. They are in duty bound to obey the command of the people, as expressed in their Constitution. The people, by section 45, supra, command the general assembly to revise and adjust the apportionment at the session next following the census. The command is clear and explicit, and the people, in inserting it in the Constitution, intended that it should be obeyed. A census was taken in 1920 and another in 1930; but the general assembly, although it met in 1921, 1923, 1925, 1927, 1929 and 1931, failed at those sessions to obey that constitutional mandate. Because of that neglect, the people, in 1932, took the matter into their own hands and adopted the initiated reapportionment act. It was not until the people had acted that the general assembly attempted to perform its duty, with the result already shown in this opinion.

 (b) It is contended that the initiated measure never became a law. The argument is this: The Initiative and Referendum Amendment (Const., art. 5, sec. 1) provides in part: "All elections on measures *referred to the people of the State* shall be held at the biennial regular general election, and all *such* measures shall become the law or a part of the Constitution, when approved by a majority of the votes cast thereon, and not otherwise, and shall take effect from and after the date of the official declaration of the vote thereon by proclamation of the governor, but not later than thirty days after the vote has been canvassed." (Italics are ours.)

It is said that this refers only to legislative bills referred to the people under the referendum provision; that there is no provision for carrying an initiated meas-

ure into effect, "and that consequently no initiated measure can become a law and take effect under our present constitutional provision." But the words "referred to the people of the state" should not be given such a narrow construction. Both legislative bills and initiated measures are "referred to the people of the state" for their approval or rejection at the polls. It is in that sense that the words are used. But if, as counsel contends, the Constitution is silent on the subject, the initiated act went into full force and effect on the date of its adoption by the people. In 59 C. J., p. 718, it is said: "In the absence of a constitutional provision stating when a law proposed under the initiative power shall become effective, such law will go into effect at the date of its approval or adoption by the people, rather than at the time the vote on the law has been officially canvassed and the proclamation of the governor issued stating the result, unless otherwise declared in the act itself."

And see *Bradley v. Union Bridge & Construction Co.* (C. C. ), 185 Fed. 544.

█ (c) It is suggested that the initiated act offends against section 21 of article 5 of the Constitution, providing that "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title." The title of the act is as follows: "An act fixing the ratios for and establishing the apportionment of senators and representatives of the general assembly of the state of Colorado." In our opinion, the act conforms to that constitutional requirement.

(d) Section 3 of article 5 provides in part: "Senators shall be elected for the term of four years except as hereinafter provided." Section 5 of article 5 is as follows: "The senators, at their first session, shall be divided into two classes. Those elected in districts designated by even numbers shall constitute one class; those elected in districts designated by odd numbers shall constitute the other class, except that senators elected in each of the

districts having more than one senator shall be equally divided between the two classes. The senators of one class shall hold for two years; those of the other class shall hold for four years, to be decided by lot between the two classes, so that one-half of the senators, as near as practicable, may be biennially chosen forever thereafter.''

■ By section 48 of article 5 of the Constitution the state was divided temporarily into senatorial districts, and in 1877 the general assembly redistricted the state. Since then the general assembly has made substantial changes. New counties have been created, new senatorial districts have been formed, counties that were in even numbered districts have been transferred to odd numbered districts, and vice versa. It is objected that the initiated act has produced confusion and uncertainty with reference to the election of senators in some districts, and violates sections 3 and 5, supra. The legislative act of 1933 would produce similar confusion and uncertainty, and all reapportionment acts that have been passed since the creation of the state produced such results. The initiated act has attempted to lessen the inconvenience by providing (§5) : ''Nothing in this Act shall be construed to work the removal of any senator from his office for the term for which he may have been elected, but all such senators shall serve the term for which they were elected; Provided, that in case of a vacancy caused by the death, resignation or otherwise of any such senator, or senators, the vacancy shall be filled from the new district, as provided for in this Act, and in the event that any new county is created at any time after the passage of this Act, and the legislature has not provided for the attaching of said new county to a specifically mentioned district, then such new county shall be deemed to be in the senatorial and representative district that said territory was in prior to its creation.''

A situation similar to ours was presented in *People, ex rel. v. Pendegast,* 96 Cal. 289, 31 Pac. 103. The same

contention as that made in the case at bar was made in that case. Answering it, the court said: "Undoubtedly these are inconvenient and deplorable results, but it must be assumed that they were foreseen and deliberately accepted by the framers of the constitution. Whatever the fact may be as to the actual amount of prescience by which the deliberations of the convention were guided, the courts in construing the constitution are bound to suppose that any inconveniences involved in the application of its provisions, according to their plain terms and import, were considered in its formation, and voluntarily accepted as less intolerable than those which are thereby avoided, or as fully compensated by countervailing advantages. But with respect to this matter, it cannot be doubted that the framers of the constitution fully understood that at every redivision of the state into senatorial districts inconveniences similar to those above set forth must necessarily ensue, and the fact that they made no provision for a remedy proves that they did not regard them as of paramount importance."

We believe that the views expressed by the Supreme Court of California are sound, and that they are applicable to the case at bar.

We cannot sustain the contention that the initiated act violates sections 3 and 5 of article 5 of the Constitution.

In conclusion, we hold that the legislative act in question is unconstitutional and therefore void, and that the initiated act in question is not open to any of the constitutional objections urged against it in this proceeding.

The judgment is affirmed.

MR. JUSTICE HILLIARD, MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND dissent.