No. 20,240.

IN THE MATTER OF LEGISLATIVE REAPPORTIONMENT, HAROLD STEIN, ETC., *v.* THE GENERAL ASSEMBLY OF THE STATE OF COLORADO, ET AL.

(374 P. [2d] 66)

Decided July 6, 1962. Reconsideration denied July 12, 1962.

Mr. CHARLES GINSBERG, Mr. GEORGE LOUIS CREAMER, for petitioner.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. RICHARD W. BANGERT, Assistant, Mr. DONALD S. MOLEN, Special Assistant, for respondents.

Members of the General Assembly appearing pro se.

Mr. CHARLES S. VIGIL, Mr. RICHARD S. KITCHEN, for intervenors Federal Plan for Apportionment.

Mr. FRED M. WINNER, Mr. WARREN O. MARTIN, Mr. WILLIAM G. BERGE, Amici Curiae.

*En Banc.*

MR. CHIEF JUSTICE DAY delivered the opinion of the Court.

THIS matter is before the court on original proceedings seeking the issuance of a prerogative or remedial writ.

■ It is apparent from the prayer of the petition and from the answers to the show cause orders issued by the court pursuant to said prayer that the relief asked for is not within the constitutional powers of this court to grant. It has long been the established rule, however, confirmed by the Colorado Rules of Civil Procedure, that if the allegations of the petition are such as to invoke both the jurisdiction of the court and to entitle the petitioner, on the face thereof, to some relief, the mere fact that one misconceives his remedy will not deprive the court of jurisdiction to act.

■ Before proceeding, however, to a discussion of: first, the jurisdiction of the court and second, whether it is incumbent upon the court to act at this time, we wish to state at the outset that under the separation of powers doctrine we cannot and will not command the Governor to do anything, the doing of which lies within his sound discretion, and we deem his authority to call the Legislature into special session to be such prerogative. Veto Power, etc., 9 Colo. 642.

It appears from the Governor's answer that conceiving it is his duty to call the matter of apportionment to the attention of the 43rd General Assembly, he twice

included the matter among the subjects presented to the Legislature for consideration. He states, and we agree, that he was powerless to do more.

As to the other officers of the state, to-wit: the Secretary of State and the Treasurer, we concede, as averred in their answer, that this court cannot and should not enjoin upon them duties that they do not have under the constitution or prohibit them from exercising duties imposed upon them by the constitution. The Secretary of State has no discretion but to carry out the election laws as prescribed by statute, and the Treasurer, on vouchers properly presented to him, where appropriations have been made therefor, must make disbursements as commanded by said vouchers. Accordingly, the rule as it affects the Governor, Secretary of State and Treasurer is discharged.

## 1. JURISDICTION OF THE COURT

■ We proceed now to the question of the jurisdiction of this court over the subject matter of the petition. Petitioner has alleged facts and has referred to the constitutional provisions and statutes which in their materiality to the issues framed are either admitted or are so well known and generally accepted that the court will take judicial notice thereof. In summary, pertinent allegations are that the General Assembly has never provided for a state census; an enumeration made by the authority of the United States was last made in the year 1960; the current (43rd) General Assembly sat in the years 1961 and 1962, and it is not scheduled regularly or automatically to sit again; the matter of apportionment by the senators and representatives was brought before the General Assembly in both years, but no reapportionment act was enacted; the statutes of Colorado relating to apportionment are C.R.S. '53, 63-1-1 to 63-1-8, inclusive. There are general allegations in the petition concerning approximate population figures, later embellished in a memorandum brief under the statement of facts by actual figures taken from the official 1960

Federal census. From all that appears, both in the petition and the memorandum brief of petitioners, the parties are entitled to call these matters to the attention of the court. In at least a half dozen cases, commencing with *Baker v. Carr*, 369 U.S. 186, 7 L. Ed. (2d) 663, the Supreme Court of the United States has made this plain. As was said recently in *Asbury Park Press., Inc., v. Wooley*, 33 N.J. 1, 161 A. (2d) 705:

"The judicial branch of the government has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights granted thereby to the people. In this sphere of activity the courts recognize that they have no power to overturn a law adopted by the Legislature within its constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such case lies with the people. But when legislative action exceeds the boundaries of the authority delegated by the Constitution, and transgresses a sacred right guaranteed to a citizen, final decision as to the invalidity of such action must rest exclusively with the courts. It cannot be forgotten that ours is a government of laws and not of men, and that the judicial department has imposed upon it the solemn duty to interpret the laws in the last resort. However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it. State v. Wrightson, supra, 56 N.J.L. at page 209, 28 A. at page 65. The authority and the duty to act when our jurisdiction is invoked in cases like the present, in the words of Chief Justice Beasley in State v. Rogers, 56 N.J.L. 480, 615, 28 A. 726, 757, 29 A. 173 (Sup. Ct. 1894), is 'so entirely established as not to be debatable.' And as the present Chief Justice said in Village of Ridgefield Park v. Bergen Co. Bd. of Taxation, 31 N.J. 420, 426, 157 A. 2d 829, 832 (1960), when it is regularly invoked we cannot 'properly look the other way.' "

The majority opinion then went on to say:

"From the foregoing it is manifest that the triunity

of our government is not invaded by acceptance of this litigation for decision. If by reason of passage of time and changing conditions the reapportionment statute no longer serves its original purpose of securing to the voter the full constitutional value of his franchise, and the legislative branch fails to take appropriate restorative action, the doors of the courts must be open to him. The lawmaking body cannot by inaction alter the constitutional system under which it has its own existence."

Since it is abundantly clear that this court has jurisdiction, we come to the question: Was it mandatory under the plain wording of the Constitution for the 43rd General Assembly to enact a reapportionment bill in any of the three sessions held by it?

The answer to this question lies in a reasonable interpretation of Article V, section 45, of the constitution which reads:

"The general assembly shall provide by law for an enumeration of the inhabitants of the state, in the year of our Lord 1885, and every tenth year thereafter; and at the session next following such enumeration, and also at the session next following an enumeration made by the authority of the United States, shall revise and adjust the apportionment for senators and representatives, on the basis of such enumeration according to ratios to be fixed by law."

It is the contention of the petitioner herein that the 43rd General Assembly defaulted in the duty imposed upon it by the above sections in 1961 and again in 1962. If such default did occur, then this court cannot stand by and permit by inaction defiance of the constitution — anymore than we can sustain affirmative action of a legislature in plain violation of the constitution. However, there is restraint imposed upon the judiciary in all constitutional questions, i.e., that the violation must appear beyond all reasonable doubt.

There is also a presumption in which the court must indulge, namely, that the Legislature has acted

according to its oath to uphold the constitution unless the contrary appears beyond doubt. "A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an *in terrorem* argument based upon the motion that members of a coequal part of the government will not be just as respectful and regardful of the obligations imposed by their similar oath. Any less faith on our part would be an unbecoming and unwarranted reflection on the Legislature." *Asbury Park Press, Inc., v. Woolley,* supra.

A step by step analysis of the legislative history of 1961, 1962 as revealed in the answers filed discloses some facts which cast doubt upon whether the constitution imposed any duty on the current 43rd General Assembly now in recess sine die. From the answer of the Governor we are informed that he was not able to certify to the Legislature the enumeration of the various counties and legislative and senatorial districts until March 21, 1961, at which time he sent a message to the General Assembly then in session. We note from other available data that as of that date the 43rd General Assembly had been in session almost three full calendar months and was preparing to adjourn, which it did on April 4, 1961. It seems clear that the 1961 session then cannot be construed to be the "session *next* after the enumeration" because that one was for all practical purposes past. Actually the *next* session was in June 1961 — an extraordinary one — lasting two days and called especially to correct some school finance legislation. One could not contend that it was *mandatory* under the constitution to enact reapportionment legislation at the "next" session because of limitations in the call of the Governor which prevented any such consideration by the Assembly.

 We then look at the 1962 session. Such even-numbered annual sessions were not provided for at the time section 45 was embodied in the original constitution. Though section 45 remains unchanged, a 1950

amendment to the constitution provided for annual sessions in place of the bi-annual session which had been held for 74 prior years. But the session in the even-numbered years is also a "limited one" in which only fiscal matters and bills "pertaining to subjects designated by the Governor in writing during the first ten days of the session" can be considered. So there is still only one session every two years in the odd-numbered years in which the Legislature has unlimited control over the bills to be introduced. True, the Governor designated reapportionment legislation as one of the subjects which the Assembly *might* consider in this session. But it is not mandatory by any law or constitutional provision that he do so and had he failed or refused to, the Legislature could not have even discussed the subject. A mandatory duty is one *directly imposed* without the discretion or intervention of any third party either required or permitted. Thus to effect enactment of a reapportionment bill in 1962 *required* the intervention of the Governor to make its performance possible. Can we, therefore, say that what was before the Assembly only by virtue of the Governor's call is a subject matter to be characterized as *mandatory* upon the 43rd General Assembly, or merely permissive? The Legislature tried to enact a bill. More than a half dozen different versions were introduced, and many legislators labored long and hard but fruitlessly to enact a suitable statute. The question is, was the constitution defied when they failed? Was this an invidious and deliberate discriminatory action? We think not. With the presumption in favor of the Legislature performing its duty and discharging its oath, the constitutional mandate to reapportion did not devolve on the 43rd General Assembly but rather such legislation is not mandatory until the 44th General Assembly convenes. We hold that we can and must await the action of the 44th General Assembly.

Such an interpretation does not do violence to the

constitution, is a reasonable one, and is consistent with the history of Colorado reapportionment enactments in the past. Such an interpretation still gives to the people reapportionment in the 10th year following the last enactment in 1953. Historically, in 1913, 1933 and 1953 reapportionment was considered and enacted by the session of the *General Assembly convened* next following the enumeration. The many years of unchallenged practical application given to the words used in the constitution, if interpolated, give it an unambiguous meaning so as to make the section read, " * * * and at the session [of the general assembly] next following such enumeration and also at the session next following an enumeration made by the authority of the United States shall revise and adjust the apportionment * * * ." Why should the judiciary command reapportionment as early as the eighth or ninth year since the 1953 apportionment? If it is our duty to do so, then we must not shirk it, but if it is not required for us to act forthwith, we should await the proper time. If we must act in the future we will have to arrive at some workable solution. At this moment it does not appear that the suggested election at large would be feasible, though we may come to it. Obviously it would destroy all districts, even those entitled to the number of representatives they now have. We believe that in sections 5 and 47 of the constitution (Article V) districting by the Legislature is contemplated. Originally sections 48 and 49, Article V, provided for districting. The repeal of those sections in 1950 was, in our opinion, intended only to delete from the constitution those sections which became self-eliminated once the Legislature had divided the state as therein commanded, as was done for the first time in 1887. Problems posed by a mandate from us ordering a legislative election of 100 members-at-large staggers the imagination, and we trust we will be able to determine a better solution if we come to the point of directive decision. We can see that aside from

the fact that there is no election law to guide the conventions of political parties in the process of nominating such members-at-large, the ballot would be unmanageable. Voting machines could not be used. Paper ballots in every county would have to contain at least 130 candidates for representatives and at least 34 for the office of senator upon which the people could vote for any 65 for representatives. They would have the choice of only 17 for senators because half of the senate is composed of hold-over senators elected for four years. In addition there would be all the candidates for county and state offices and several constitutional amendments. A lengthy paper ballot so composed would be of such proportions as to be almost impossible to read or vote upon, and even more staggering to tally and certify. And the resultant composition of the Legislature would compound present alleged inequities.

As for the future — if we were now to hold the Legislature to be required to reapportion in the second or even-year of the decade, we would have a precedent-making decision encroaching upon the discretion of all future governors, compelling them to include reapportionment in every call in the even-numbered years. That would be an invasion of the executive branch for 1972 or 1982, etc., when all agree the judiciary has no such powers.

Another compelling reason to withhold action until after the 44th General Assembly is organized and convened is present. By reason of the showing made by intervenors in these proceedings we are informed that the people have taken this problem unto themselves for solution by constitutional amendment. And, since in Colorado, as distinguished from *Baker v. Carr*, supra, all power has been reserved by the people through the initiative and referendum, there is no need for the judiciary to take action until it is determined that both the people and the Legislature have failed to act. Retaining jurisdiction until other processes of govern-

mental structure have had an opportunity to function is not without precedent. In *Magraw v. Donovan,* 163 F. Supp. 184 (D.C. Minn. 1958) a three-judge Federal court retained jurisdiction of a similar justiciable issue and declared:

"It seems to us that if there is to be a judicial disruption of the present legislative apportionment or of the method or machinery for electing members of the State Legislature, it should not take place unless and until it can be shown that the Legislature meeting in January 1959 has advisedly and deliberately failed and refused to perform its constitutional duty to redistrict the State."

See also *Asbury Park Press, Inc. v. Woolley,* supra, wherein the New Jersey court retained jurisdiction through adjournment of the next legislative session.

We believe there should be no judicial intrusion into the legislative and executive affairs of the state, and we should be ever mindful of the necessity of preserving the integrity and independence of the coordinate branches of government. We should, therefore, exercise an appropriate degree of restraint to see if they will carry out their duties. Only if both they and the people fail to act will it become a judicial function to step into the void.

It has been called to our attention that in Tennessee on June 22, 1962, (U.S.D.C. No. 2724, Nashville Div.) a three-judge federal court acting pursuant to the mandate of *Baker v. Carr,* supra (the land-mark case from which flows all current reapportionment litigation) decided to retain jurisdiction to give the Tennessee legislature "an opportunity at its 1963 session to enact a fair and valid reapportionment." As authority for so doing the court cited similar procedures in *McGraw v. Donovan,* D.C. Minn. (1958), supra, *Toombs v. Fortson,* N.D. Ga. (May 25, 1962), 205 F. Supp. 248, (involving the legislature of Georgia); and the recent Alabama case of *Sims v. Frink,* 30 Law Week 2512. Then the court said:

"We have confidence that a legislature so elected, having before it the views of the Court * * * as the recent legislature did not, will adopt a plan of reapportionment which will comply with the commands of the Federal Constitution."

So too, then, do we express confidence in either the people adopting a reapportionment amendment at the polls in November 1962 or in the Legislature appropriately amending the present statutes at the 1963 session. As was said by Mr. Justice Moore in *Four-County Met. C.I. Dist. v. Board of County Comm'rs.*, 149 Colo. 284, 369 P. (2d) 67, referring to the "Home Rule Amendment" to the constitution:

" * * * If in fact the home rule provision of the constitution is obsolete the remedy is to bring about its repeal or amendment. It would indeed be a 'black day' for Denver as well as for the entire state of Colorado if this court were to presume to amend or repeal this provision of the constitution by judicial fiat. * * * "

We add that if the original concept that the Legislature should have both the right and the duty to reapportion itself seems now unfeasible or if it is intended that the Legislature must consider reapportionment at the "very first opportunity" following a Federal census, then the remedy is a constitutional amendment. Many thousands of the electorate have felt some change is needed and have taken the appropriate steps to submit it to a vote. Whether such action will solve the problem must await the passage of time.

And time is what we should await now. Should the constitution be amended, then there would be no duty on the 44th General Assembly to enact a reapportionment bill, except as directed by the new amendment. Should the people fail to adopt one of the amendments to appear on the ballot, then we hold the duty on the 44th General Assembly to be mandatory.

Accordingly, an order will be entered reserving final judgment herein on all issues until either a constitutional

amendment has been passed by the voters in November 1962 or until the 44th General Assembly in its 1963 session has had an opportunity to act in the matter, but in the case of the latter such action to be not later than June 1, 1963. After that date or after the Legislature has adjourned, if there is no new constitutional amendment or no proper legislative reapportionment enacted, the case may be reopened upon application of any party or upon the court's own motion. Notwithstanding such time limits, full jurisdiction is retained.

MR. JUSTICE SUTTON, MR. JUSTICE MCWILLIAMS and MR. JUSTICE PRINGLE concur.

MR. JUSTICE MOORE and MR. JUSTICE FRANTZ dissent.

MR. JUSTICE HALL specially dissents.

MR. JUSTICE SUTTON also specially concurs.

Though I concur in the majority opinion I desire to comment upon another matter not fully treated therein and not discussed by either Mr. Justice Moore or Mr. Justice Hall in their separate dissents.

I am persuaded that we cannot act at this time because the people of Colorado have wisely and validly reserved to themselves the right and power to correct such matters as the one in dispute by use of the initiative and referendum (Art. V, Sec. 1, The Colorado Constitution). Such a reserved power in the voters in Colorado distinguishes the present case from *Baker v. Carr*, 369 U.S. 186, 7 L.Ed. 663, 82 S.Ct. 691. In Tennessee, where *Baker* arose, *the voters had no way to correct the political inequality which has long existed.* They were, in effect, remediless unless the judiciary assumed the responsibility of fashioning appropriate relief to insure constitutional voting rights. In *Baker* immediate judicial action was proper but even there the remedy could not be made available forthwith.

Here if the petitioner is not afforded relief either by action of the electorate in the November 1962 election or by the Forty-fourth General Assembly, then it will be the duty of this court under the *Baker* decision to take appropriate action.

I believe that matters such as the proportionate equality of voting stand on a somewhat different procedural plane for action than some other constitutional rights which require very prompt if not instantaneous adjudication by the courts to render effective relief. For example, if petitioner had been denied his right to vote at all, we would have a different problem. Or, if he were charged with a crime or were imprisoned without charge, then we would forthwith rule on his right to a writ of habeas corpus or to other protections to which he is entitled.

My belief that proportionate equality of voting is different is twofold: First, by its very nature it is a political problem. Constantly shifting population in affected areas make exact mathematical representation, even if required, impossible to attain or to maintain, even if by some legerdemain population in such areas could be kept static. Second, due to shifting population and the imbalance that results, it is obvious that for at least nine year periods (assuming representation were readjusted each tenth year) voters in the growing areas could be validly (but temporarily) denied theoretical equality. Even Mr. Justice Moore seems to accept such a constitutional lag.

Therefore this petitioner because of the political nature of the relief sought must await the turning of the wheel until it touches his grounded rights.

Thus my position over and above that of the majority opinion is that relief under the circumstances in Colorado must await first of all, the required constitutional span of time, then legislative action within the required period, and, if the latter fails then either timely action by the people by initiative and referendum (as is being

sought here) or judicial action. The judiciary to intervene, however, only if the legislature or voters fail to act appropriately within a reasonable time.

Mr. Justice Pringle states that he concurs in these views as well as with the majority opinion.

MR. JUSTICE MOORE dissenting.

This is an original proceeding commenced by the petition of Harold Stein, a citizen, taxpayer, and resident of the City and County of Denver, presenting to the court questions concerning the validity of the statutes of Colorado relating to legislative districting, and claiming the existing legislative districts to be invalid as a violation of equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States, and as being in violation of the Colorado Constitution, Article V, Section 45.

Article V, Section 45, of the Colorado Constitution provides:

"The General Assembly shall provide by law for an enumeration of the inhabitants of the state, in the year of our Lord 1885, and every tenth year thereafter; and at the session next following such enumeration, and also at the session next following an enumeration made by authority of the United States, shall revise and adjust the apportionment for senators and representatives, on the basis of such enumeration according to ratios to be fixed by law."

Chapter 63, Article I, Section 2, C.R.S. 1953, fixes and establishes ratios for apportionment of senators and representatives in the general assembly as follows:

"(1) The ratio for the apportionment of senators shall be:

"(a) One senator for each senatorial district for the first nineteen thousand of population therein;

"(b) One additional senator for each senatorial dis-

trict for each additional fifty thousand of population therein or fraction over forty-eight thousand.

"(2) The ratio for the apportionment of representatives shall be:

"(a) One representative for each representative district for the first eight thousand of population therein;

"(b) One additional representative for each additional twenty-five thousand five hundred of population therein, or fraction over twenty-two thousand four hundred."

Senatorial districts are established by Section 63-1-3, C.R.S. '53. Districts for the election of members of the House of Representatives are established by Section 63-1-6, C.R.S. '53.

Memoranda have been furnished the court by the petitioner, as well as by various of the respondents, and by the Attorney General representing the respondents generally, and the court has heard extensive oral argument. It appears from these presentations, without dispute, that the General Assembly has held sessions as prescribed by the constitution in 1961 and 1962, following the enumeration of population or census made by authority of the United States in 1960. The last of those sessions has been recessed and adjourned. The general assembly did not, as required by Article V, Section 45, revise and adjust the apportionment for senators and representatives on the basis of the 1960 census according to ratios to be fixed by law.

Applying the ratios prescribed by C.R.S. '53, 63-1-2, and utilizing the census figures, of which this court may take judicial notice and which are before the court in memoranda, it is clear that at least one county with a population of 7,867 has fewer than the minimum 8,000 required for the election of a representative. At least one senatorial district, the sixth, with 18,414 people, has fewer than the 19,000 population required for such a district. It is clear, also, that other counties, including the City and County of Denver, the counties of Adams,

Jefferson, and Arapahoe, and other more populous counties, have substantially less representation in each of the houses of the general assembly than they are entitled to under the provisions of Chapter 63, C.R.S. '53.

Colorado's population in 1960 was 1,753,948, an increase of 32.4% over that in 1950. Urban population has increased 55.5%, and rural population declined by 6.6% in that period.

Article V, Section 46, of the Colorado Constitution provides: "The senate shall consist of not more than thirty-five and the house of not more than sixty-five members."

Proportioning such membership to the total population, we find that each member of the Senate should represent 50,112 citizens, and each member of the House 26,983. In the least populous representative district, 7,867 persons are represented per member. In the City and County of Denver, 29,000 are needed to accomplish the same result. In Jefferson county, approximately 63,000 votes are needed, and in Adams, Jefferson and Arapahoe counties on an average 60,250 are needed for this purpose. Like results apply to many others of the populous counties and similar situations exist in both the house and senate. A voter in the least populous county is, therefore, eight times as significant as one in the most populous counties.

Petitioner contends that such result is unconstitutional as a violation of the Fourteenth Amendment in that it is a "debasement of his vote," a denial of equal protection of the law, and that the statute of Colorado under which this gross discrimination exists is violative of the Colorado Constitution, Article V, Section 45.

There is no controversy as to the factual existence of the representative situation described. The census, of which we take judicial notice, sustains these facts, and the responses filed raise no issue in connection therewith.

In *Armstrong v. Mitten, et al.*, 95 Colo. 425, 37 P. (2d)

757, Chapter 156, Session Laws of 1933, was held void because it violated Article V, Section 45, of the Colorado constitution in many of the ways C.R.S. '53, 63-1-1, et seq. is said to offend. It was said in that case that the Act there held to be void "attempts to confer upon some districts a representation that is greater, and upon others a representation that is less, than they are entitled to under the Constitution," and that the requirements of Article V, Section 45, were mandatory, saying: "The people, by section 45, supra, command the general assembly to revise and adjust the apportionment at the session next following the census. The command is clear and explicit, and the people, in inserting it in the Constitution, intended that it should be obeyed."

Petitioner relies upon *Baker v. Carr,* decided by the Supreme Court of the United States, No. 6, October term, 1961, on March 26, 1962. In that case it is expressly held, with reference to a citizen's suit for reapportionment, "(a) that the court possessed jurisdiction of the subject matter; (b) that a justifiable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) because appellees raise the issue before this Court, that the appellants have standing to challenge the Tennessee apportionment statutes. Beyond noting that we have no cause at this stage to doubt that *the District Court will be able to fashion relief if violations of constitutional rights are found,* it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial." (Emphasis supplied.)

Respondents contend that our government is one of divided powers, namely, the Legislative, Executive, and Judicial. They argue that even though the legislative branch has failed in the performance of a duty mandatory under the constitution, the judiciary is powerless to remedy the situation, since it can neither compel executive action to call the legislature into session, nor compel the enactment of legislation once that session is convened.

Article VI, Section 3, of the Colorado Constitution provides that this court, "shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction, and other original and remedial writs, with authority to hear and determine the same; and each judge of the supreme court shall have like power and authority as to writs of habeas corpus. * * *" It is fundamental that the duty of this court is to uphold the constitutions, of both Colorado and the United States. It is equally fundamental that a statute shown to be in violation of either constitution, such statute is void, and this court has the duty to so declare.

For the reasons stated above, it is clear that C.R.S. '53, 63-1-2, 3 and 6, are void and of no effect as in direct violation of Article V, Section 45, of the Constitution of the State of Colorado, and of the equal protection provisions of the Fourteenth Amendment to the Constitution of the United States, and we should declare them void. *Armstrong v. Mitten,* supra.

Article V, Section 47, of the Colorado Constitution in pertinent part provides: "Senatorial and representative districts *may* be altered from time to time, as public convenience may require. * * *" (Emphasis supplied.)

*Nothing in the Constitution of Colorado requires any specified number of representative districts for either house of the general assembly.*

Rule 54(c) of our Rules of Civil Procedure states that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." We have held that under this rule it is the duty of the court to grant all equitable relief to which a party is entitled, even though not specifically demanded in the prayer. *Spears Free Clinic & Hospital v. Board,* 122 Colo. 147, 220 P. (2d) 872. Such clearly is the authority under the original jurisdiction vested in this court by the Constitution of Colorado, and such is the anticipation of the

Supreme Court of the United States as stated in *Baker v. Carr,* supra.

This court recognizes the fundamental concept of our governmental structure embodied in the separation of powers of government into three departments. This court has in the past, and in this controversy should give full effect to the limitations placed upon the power of the judiciary by Article III of the Constitution of Colorado. We can not, constitutionally, do for the legislature those things which the constitution specifically provides shall be done by that branch of the government. It is, however, the exclusive function of the judiciary to determine whether enactments of the legislature conform to the limitations placed upon the power of that branch of government by the constitution. *It is also the exclusive function of the judiciary to declare the legal result which comes into existence when the legislative branch of the government fails to do that which the constitution very plainly commands that it shall do!*

It is admitted by all participants to this controversy that the 43rd general assembly has failed to obey the mandate of the constitution which forcefully commands that, "the general assembly * * * *at the session next following* an enumeration made by the authority of the United States, *shall* revise and adjust the apportionment for senators and representatives on the basis of such enumeration according to ratios to be fixed by law." (Emphasis supplied.)

The people trusted the legislative arm of government to obey this mandate; but admittedly it has failed to perform its duty pursuant to that command. The remedy of the people who seek redress for such breach of trust is to replace those who neglect or refuse to perform their constitutional duty and to supplant them with persons who will be governed thereby.

A plausible argument is advanced in support of the power of this court to do for the people that which the legislature has failed to do, in defiance of the express

command of the constitution. Were we to explore this suggestion we would necessarily proceed with due restraint, careful not to subject the judiciary to the charge of usurping powers entrusted by the constitution to other departments of government.

It is argued contra, that for this court to undertake to re-district the state and reapportion seats in the general assembly, in the absence of legislative action, would be the performance of a legislative function. It is contended by petitioner that the application of a mathematical ratio, or the solution of an equation, is not a discretionary but a ministerial function of the kind often performed by the courts and which might lawfully be performed in this case.

It is not necessary, however, for the court to embark upon such adventure, for the reason that the net result of the failure of the legislature to function gives rise as a matter of law to a situation concerning which there can be no doubt. Recognition of that situation and a clear statement thereof affords full protection to petitioner, removes all doubt as to whether he will be denied equal protection of the law in the forthcoming election, and upholds the pertinent provisions of the Colorado Constitution. It involves no question of usurpation by the court of power properly belonging to other departments of government.

We cannot properly command the governor to call a special session of the general assembly; we cannot properly require any member of the legislature to vote for or against a particular piece of legislation. The legislator is not responsible to this court for his conduct. He is responsible to his constituents alone. However the legal consequences which follow from its acts, or its failure to act, are matters which the judiciary alone can pass upon.

It is quite certain that no act of the legislature, and no failure on its part to do that which the constitution commands that it "shall" do, can produce a result pro-

hibited by the Constitution of the United States. By action or inaction no citizen can be deprived of the equal protection of the law. The judiciary has inherent power to "fashion relief" necessary to prevent violations of constitutional rights.

The question, therefore, to which we should limit this inquiry, is:

*What is the legal consequence of the failure of the legislature to obey the mandate of the constitution with reference to reapportionment?*

In the case before us the petitioner is entitled to equal protection of the law — NOW! The protection afforded the individual by the United States Constitution cannot be temporarily suspended by state action or inaction! That which deprives a citizen of this "equal protection" must be swept aside and held for naught, even though it be an act of the general assembly or a provision of the state constitution!

Inasmuch as C.R.S. '53, 63-1-2, 3 and 6, are void as above stated, they cannot be given force or effect. Accordingly, by reason of the failure of the general assembly to obey the mandatory requirements of Article V, Section 45, of the constitution, there exist no senatorial or representative districts legally in force in this state.

It is necessary, however, that there exist a legislative body for this state. The constitution in Article V, Section 46, supra, provides that the general assembly consist of a senate of not more than thirty-five and a house of not more than sixty-five members. Under valid provisions of existing law the number of legislators has been fixed at this maximum. No minimum number of districts is provided, and districts may be altered under Article V, Section 47, "as public convenience may require."

It is our duty in such circumstances to give effect to the constitution as it exists in so far as it may be enforced. Since the statutes relating to districting and ratios are void, they cannot be utilized. Therefore, the

general assembly consisting of a Senate of thirty-five members and a House of Representatives of sixty-five members should be elected from the state at large and by the voters of the state at large.

The Secretary of State of the State of Colorado should be prohibited from permitting the conduct of elections in accordance with the ratios or districting provided in the void chapter 63, Article I, Sections 2, 3 and 6, and should be required to conduct the forthcoming general election in so far as concerns election of members of the general assembly, both Senate and House of Representatives, in such manner that said election is of those persons at large, thirty-five members of the Senate and sixty-five members of the House of Representatives, by the eligible electors of this state, without regard to the representative or senatorial districts or apportionment heretofore recognized.

An opinion of this court should be and constitute an affirmative order to the Secretary of State to the effect set forth herein. No force or effect should be given in any election to the said senatorial or representative districts or existing apportionment, nor should any election be held for the general assembly, including Senate and House of Representatives, of the State of Colorado, save an election at large, *until such time as there shall have been established districts and an apportionment in accordance with the provisions and requirements of Article V, Section 45, of the Constitution of the State of Colorado, and the Fourteenth Amendment to the Constitution of the United States.*

The failure of this court to act affirmatively at this time in a way to grant voting equality is, in effect, an unnecessary delay in the performance of a judicial act which would immediately protect basic rights. The determination of judicial questions and the ultimate protection of constitutional rights rest exclusively with the judicial department of government. Every member of the general assembly admits that the duty imposed upon

them by the mandate of the people in the constitution has not been performed. It is not disputed that the only act of the legislature under which its members are selected is unconstitutional and void. It is admitted that unless this court pronounces the legal result which follows legislative failure, the constitutional rights of tens of thousands of citizens will be denied. The rights involved are the most cherished rights of equality at the ballot box in free elections!

If it be true that an election of legislators at large would cause difficulties or present problems too difficult for some areas to solve, those difficulties and problems would be apparent to those who themselves are directly responsible for their creation. There is ample time before the November election for the general assembly to perform its constitutional duty, and thus remove any and all of the envisioned difficulties, most of which are imaginary and speculative and at best are inadequate excuses for failure to protect constitutional rights. The mandate of the constitution cannot be temporarily suspended by resort to lame excuses for failure to discharge mandatory duties.

There is nothing in the record to indicate that the governor has in any manner failed to do all within his power to uphold the provisions of the state and federal constitutions. Many able members of the legislature strove mightily to discharge their constitutional duty. There is no reason to believe that the chief executive would fail to afford an opportunity to the legislature to remove any complications which might result from an election-at-large and to make provision for the political parties to make selection of candidates if existing laws are, in fact, inadequate for that purpose.

There remains for consideration one further "excuse" for failure of this court to resolve the question by affirmative action. Article V, Section 45, provides that *"at the session next following an enumeration* made by the authority of the United States" the general assembly

shall revise and adjust the apportionment for senators and representatives, on the basis of such enumeration, according to ratios to be fixed by law.

It is contended that the "session next following" the enumeration does not take place until 1963. This does not follow from the wording itself. The census was taken in 1960. There was a session of the legislature in 1961. There was another in 1962. Nothing was done by the legislature in either session. The Governor recognized that it was mandatory that something be done *in those sessions*, and so did the legislature.

There has been a Response to Rule to Show Cause filed by the Attorney General for all of the Respondents. The Response of the Governor states as follows, on page 2:

"(3) The Governor performed his duty as chief executive officer of the State of Colorado when he reported to the first regular session of the Forty-third General Assembly *on March 21, 1961,* and requested that the legislature reapportion itself in compliance with Article V, Section 45, of the State Constitution.

"(4) The Governor performed his duty again in 1962 when he reported on January 3, 1962, that the official census had been obtained and that the legislature should adopt a new apportionment law."

Thus, the Assembly was informed both in 1961 and in 1962 that it must reapportion on the basis of the 1960 census, and it was provided with that census.

The Assembly itself recognizes the requirement that it reapportion and its duty to do so in the 1961-62 sessions. Thus, in the Response of General Assembly, on page 6 of the Attorney General's filing it is said:

"(10) The Colorado Constitution in Article V, Section 45, requires the General Assembly to revise the apportionment for senators and representatives following the enumeration of inhabitants by the Bureau of the Census of the United States, and *this duty is and has been recognized by the General Assembly* because bills

were introduced in both sessions of the Forty-third General Assembly to accomplish this objective.

"(11) Although an apportionment act was not adopted by the Forty-third general assembly because of a disagreement among its constituent members, they have not wilfully ignored this constitutional mandate."

Again, in the Response of all Respondents, on page 7 of the Attorney General's filing, it is said:

"(5) Two bills and two amendments to the Constitution of Colorado were introduced in the First Regular Session of the Forty-third General Assembly, and eight bills and six amendments to the constitution were introduced in the Second Regular Session of the Forty-third General Assembly dealing with apportionment, but none of them passed, showing that the General Assembly has attempted to obey its constitutional mandate to apportion the legislature *based on the federal census in 1960.*"

The applicable census volume is that volume which is captioned by SUGGESTED CITATION on page ii thereof; "U. S. BUREAU OF THE CENSUS, U. S. CENSUS OF POPULATION; 1960. NUMBER OF INHABITANTS, COLORADO. FINAL REPORT PC(1)-7A." It is claimed that this was not available in 1961. On page iii is the Preface and the Acknowledgments. THESE ARE DATED: *"February, 1961."*

Not only was the document available in 1961, but it was sent by the Governor to the General Assembly then in session in that year. The session next following the 1960 census. The Attorney General has filed a Memorandum in Support of Response here. On page 4, he states, for the Governor, as follows:

"c. The Governor has diligently upheld his oath of office by doing everything within his executive powers to cause apportionment and aid the General Assembly of the State of Colorado to enact laws apportioning the state legislature, including, but not limited to, the following, to-wit:

"(1) On March 21, 1961, the Governor sent to the 43rd

General Assembly of the State of Colorado, 1st Regular Session (1961) the following official message, which appears in the Senate Journal of said session for Thursday, March 23, 1961, at page 611, and in the House Journal of said session, for March 22, 1961, beginning at page 764, to-wit:

"MESSAGE FROM THE GOVERNOR.

March 21, 1961.

"Forty-third Colorado General Assembly.

"I have just received from the Bureau of the Census, U. S. Department of Commerce, and I have the privilege of *transmitting to you,* the official 1960 Census of the State of Colorado.

"This report is forwarded to you for your appropriate action regarding apportionment of legislative representation in accordance with the directives of the Constitution of Colorado, Article V, Sections 44 through 47.

Steve McNichols."

"(2) On January 3, 1962, the Governor sent to the 43rd General Assembly of the State of Colorado, 2nd Regular Session (1962) the following official message, being the Governor's first message to said session, wherein there were designated subjects to be considered by said general assembly, which message appears in the Senate Journal of said session for Wednesday, January 3, 1962, beginning at page 5, and in the House Journal of said session for Wednesday, January 3, 1962, beginning at page 7, to-wit:

"MESSAGE FROM THE GOVERNOR

January 3, 1962.

"To the Forty-third General Assembly.

"State of Colorado

"Ladies and Gentlemen:

"Pursuant to the authorization contained in Section 7, Article V of the Constitution of the State of Colorado, wherein it is provided that the General Assembly in even numbered years may enact bills raising revenue,

bills making appropriations and may also enact bills pertaining to subjects designated in writing by the Governor during the first ten days of the session, I hereby designate the following subjects at this time for appropriate actions:

"1. Reapportionment of members of the General Assembly.

\* \* \*

"Respectfully submitted,
"Steve McNichols, Governor."

Thus it is clear, from the very Response of the Governor and the General Assembly, that both knew that the matter of reapportionment had to be done in 1961 and 1962, that the census existed and was furnished to the general assembly in 1961, and it was then before them, that the Governor twice called upon the Assembly to apportion, that the Assembly recognized and recognizes in its response that it has a "mandate" to reapportion in 1961 and 1962, and that it introduced numerous bills and amendments to that end, but failed to enact any of them. It is utterly impossible in this situation to credit the contention that the duty is to be performed instead in 1963, or that the Assembly did not have the census data, because from its own showing it not only had the census data before it and recognized its duty, but did not agree on any method of performance and did not perform.

The "interpretation" which some members of this court would give to the plain language of the constitution "at the *session next following* an enumeration" amounts to an amendment; a change in important substance, and is definitely not an "interpretation" if words still have their accepted meaning. The "interpretation" so applied amounts to a far greater usurpation by the judiciary of an exclusive legislative function than would be involved if this court were to apply a mathematical equation and order reapportionment on the basis thereof. By this "interpretation" we would amend the con-

stitution as adopted by the people! To me this is unthinkable!

Even though the "interpretation" were to be adopted it would solve only fifty per cent of the problem and leave entirely untouched the very important provision of the United States Constitution, that no person shall be denied "equal protection of the law." In other words, the United States Constitution emphatically declares that under no interpretation of state law can one man's vote in this nation be worth eight times as much as another's, even though by a fantastic "interpretation" of a state constitution one might give that inequality a mask of legality when tested at the state level.

This court should give affirmative relief and breathe strength and vitality into the constitutions of the state and the nation! If a temporary inconvenience be visited upon the citizen in a single election let him place the responsibility squarely upon those whose failure to obey the fundamental law brought about the inconvenience. It would be a cheap price to pay to avoid the emasculation and destruction of constitutional rights. Suffice it to say that no consequence resulting from judicial action which upholds and supports an unquestioned constitutional right, can ever be as burdensome or dangerous as the ultimate consequence which follows judicial emasculation and destruction of the constitutional rights here involved.

I have reached the foregoing conclusions after painstaking study and am fortified in setting them forth by the firm conviction that thoughtful citizens everywhere are more interested in the preservation of constitutional government than in avoiding spending a few more moments in the ballot booth in one election, when by doing so they gain for themselves and grant to all others equality of voting strength. I am confident that intelligent persons everywhere would approve affirmative action, the effect of which would be to prevent the disintegration and piecemeal collapse of constitutional govern-

ment. I am convinced that the preservation of our constitutional rights means more to mass humanity than the desires of those who may seek to perpetuate the existence of an office for which there is no foundation in the constitution or any valid law.

I view with deep concern and sincere regret the results which flow from the failure of the court to act. By deftly side-stepping the issue which is presented, several hundred thousand voters in Arapahoe, Jefferson, Adams, Pueblo, El Paso, Boulder, Mesa and other populous counties, as well as those in the City and County of Denver, are told by their highest court that their effectiveness at the polls at the coming election is anywhere from one-third to one-eighth as great as that of citizens residing elsewhere, and that no action will be taken by the judiciary in time to prevent that result.

Under the record before us the violation of constitutional rights is clearly shown; the remedy to stop it is clearly available, and it involves the use of a power which only the judiciary can exercise. When the legislature fails to perform its constitutional duty to correct an inequality in voting effectiveness (as great as 8 to 1); when the judiciary compounds that omission by refusing to act in its official capacity to protect basic rights when it is clear that a remedy is available — just where shall we tell the 1/8th of a citizen to go in search of the 7/8ths of his constitutionally protected right to voting equality?

As for me, I refuse to tell him that the constitution affords him no present protection. I know it does — if it is recognized! I refuse to tell him that the judiciary can do nothing about it. I know that this court could do something about it! The majority of this court, by inaction, tells this citizen in effect: "Go on home, my good man and forget about it for the time being. The constitution really doesn't mean anything in actual practice."

With what force I am able to command I protest! I

am content to let those who understand the law pass judgment on my views!

Mr. Justice Frantz concurs in this dissent.

Mr. Justice Hall dissenting:

I respectfully dissent.

I do not share the views of any of my colleagues as expressed in the majority opinion of Mr. Chief Justice Day or the dissenting opinion of Mr. Justice Moore, and feel that it is proper for me to briefly outline my views.

We have before us for consideration the petition of one Harold Stein, who appears for himself and for "all other persons similarly situate." In his petition Stein sets forth facts upon which he predicates his claim for relief from this Court. For himself and his fellow citizens he prays, in substance, that this Court:

1. Convene the General Assembly for the purpose of reapportionment.

2. Require the Governor to convene the General Assembly for such purpose.

3. Prohibit the Secretary of State from "permitting the conduct of elections or certifying to office any person as elected to the General Assembly until there be such reapportionment * * *."

4. Prohibit the State Treasurer from paying to any member of the General Assembly of any of the emoluments of his office until there be reapportionment as provided by the Constitution of Colorado.

There is no prayer for general relief or any relief other than that above specified.

Having read the majority opinion and the dissenting opinion, I conclude that my associates, who subscribe thereto, all concede that for this Court to grant any of the relief requested would be an invasion of the powers of the executive or the legislative branches of the government and beyond the powers delegated to the judiciary. I entertained and expressed those views when the

petition was first presented and cast my vote to then deny the petition. Passage of time, reading of voluminous briefs, listening to elaborate and intriguing arguments and studying the aforementioned opinions serves only to bolster my original conviction that the rule to show cause should never have been granted and that the petition should now be dismissed.

I find nothing in the majority opinion indicating that in 1963 or at any other time are any of the four members of this Court who share in that opinion going to grant any of the relief requested by Mr. Stein. If my analysis is correct, then it would seem that orderly procedure dictates that Stein's petition be dismissed *now*.

Implicit in the statement in the majority opinion, "reserving final judgment herein on all issues * * *," is a suggestion, warning, or veiled threat that if the Governor, the General Assembly, the Secretary of State, and the State Treasurer do not meet the demands of Mr. Stein prior to June 1963, they will hear further from this Court. I am of the opinion that those parties are entitled to go about the performance of their constitutional and statutory duties, answerable only to the people and their own consciences, untrammeled by threats or warnings from this Court, no matter how hollow or impotent they may be.

Both Mr. Chief Justice Day and Mr. Justice Moore point out that, under our rules of civil procedure, we may grant relief other than that sought or warranted by the petition. I do not subscribe to that construction of the rules as applicable to class actions.

Here, we have Stein coming into court and asking for certain relief for himself and 1,800,000 other citizens. Possibly the other 1,800,000 desire the same relief as Stein and are happy to have him go forth as their Sir Galahad to bring about the desired results. Their silence here is their consent. These 1,800,000 citizens may well be held accountable for, and bound by, Stein's failure to procure the relief demanded — none can be held ac-

countable for Stein's returning from the bargain counter with: (1) delay from the majority; (2) elections at large from the minority. None bargained for such result. Neither Stein nor any of his 1,800,000 fellow citizens have had their day in court on either question. No one has suggested that relief (if such it may be called) of the nature granted by the majority or recommended by the minority be visited on 1,800,000 citizens who appear in court seeking relief entirely foreign to that granted or recommended.

Clearly, the People have not entrusted to the judiciary any powers or duties pertaining to reapportionment. They placed their trust in the General Assembly and not elsewhere. The People have the reapportionment for which they bargained — that provided by the Assembly, good, bad, or indifferent, or even none in the event of its failure to act. They are getting exactly that for which the Constitution provides. To thrust upon the people any form of reapportionment other than that for which they bargained does violence to their constitutional rights.

It is probably true that the People are not getting the reapportionment which they anticipated getting or hoped for, but they are getting legislative reapportionment and that is what is provided for in the Constitution.

Steps have already been taken by the People through proposed initiated measures looking toward other and different reapportionment. As I view it, such is the only method available to divest the General Assembly of its present powers and to relieve it of its present duties with respect to reapportionment.

Certainly the People have never evinced any desire to have the judiciary take over. All members of this court recognize this fact; however, Justice Moore skirts the problem by stating that: "The judiciary has inherent power to 'fashion relief' necessary to prevent violations of constitutional rights." With that statement I am in complete disagreement.

I am fully persuaded that this court is a branch of the government vested with enumerated powers only. Powers not granted to the legislature, the executive or the judiciary are reserved to the People. That to me is elementary and fundamental. I for one lay claim to no inherent powers. Not too long ago a President of the United States, presented with a troublesome problem, as are we, concluded that he possessed inherent powers which provided the desired solution. The judiciary promptly and thoroughly rejected his assumption or exercise of such authority as being foreign to our system of government, a government predicated on the delegation of powers by the People, and retention by the People of powers not delegated.

The powers and duties of the Supreme Court are limited, well defined by the Constitution and enabling legislation. I find nothing therein remotely suggesting that this court has the power to step in and fill the breach occasioned by the failure of the executive or legislative branches of the government to perform their constitutional duties. The remedy rests in the hands of the People.

The petition should be dismissed.