377 U.S. 713 (1964)
LUCAS ET AL.
v.
FORTY-FOURTH GENERAL ASSEMBLY OF COLORADO ET AL.
No. 508.
Supreme Court of United States.
Argued March 31-April 1, 1964.
Decided June 15, 1964.
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO.
*714 George Louis Creamer and Charles Ginsberg argued the cause and filed a brief for appellants.
Anthony F. Zarlengo, Special Assistant Attorney General of Colorado, argued the cause for the Forty-Fourth General Assembly of Colorado et al., appellees. With him on the brief was Duke W. Dunbar, Attorney General of Colorado. Stephen H. Hart argued the cause for Johnson et al., appellees. With him on the brief were James Lawrence White, William E. Murane, Charles S. Vigil and Richard S. Kitchen, Sr.
Solicitor General Cox, by special leave of Court, argued the cause for the United States, as amicus curiae, urging reversal. With him on the brief were Assistant Attorney *715 General Marshall, Bruce J. Terris, Harold H. Greene and David Rubin.
MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.
Involved in this case is an appeal from a decision of the Federal District Court for the District of Colorado upholding the validity, under the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution, of the apportionment of seats in the Colorado Legislature pursuant to the provisions of a constitutional amendment approved by the Colorado electorate in 1962.

I.
Appellants, voters, taxpayers and residents of counties in the Denver metropolitan area, filed two separate actions, consolidated for trial and disposition, on behalf of themselves and all others similarly situated, in March and July 1962, challenging the constitutionality of the apportionment of seats in both houses of the Colorado General Assembly. Defendants below, sued in their representative capacities, included various officials charged with duties in connection with state elections. Plaintiffs below asserted that Art. V, งง 45, 46, and 47, of the Colorado Constitution, and the statutes[1] implementing those constitutional provisions, result in gross inequalities and disparities with respect to their voting rights. They alleged that "one of the inalienable rights of citizenship. . . is equality of franchise and vote, and that the concept of equal protection of the laws requires that every citizen be equally represented in the legislature of his State." Plaintiffs sought declaratory and injunctive relief, and also requested the Court to order a constitutionally *716 valid apportionment plan into effect for purposes of the 1962 election of Colorado legislators. Proponents of the current apportionment scheme, which was then to be voted upon in a November 1962 referendum as proposed Amendment No. 7 to the Colorado Constitution, were permitted to intervene. A three-judge court was promptly convened.
On August 10, 1962, the District Court announced its initial decision.[2]Lisco v. McNichols, 208 F. Supp. 471. After holding that it had jurisdiction, that the issues presented were justiciable, and that grounds for abstention were lacking,[3] the court below stated that the population *717 disparities among various legislative districts under the existing apportionment "are of sufficient magnitude to make out a prima facie case of invidious discrimination. . . ." However, because of the imminence of the primary and general elections, and since two constitutional amendments, proposed through the initiative procedure and prescribing rather different schemes for legislative apportionment, would be voted upon in the impending election, the District Court continued the cases without further action until after the November 1962 election. Colorado legislators were thus elected in 1962 pursuant to the provisions of the existing apportionment scheme.
At the November 1962 general election, the Colorado electorate adopted proposed Amendment No. 7 by a vote of 305,700 to 172,725, and defeated proposed Amendment No. 8 by a vote of 311,749 to 149,822. Amendment No. 8, rejected by a majority of the voters, prescribed an apportionment plan pursuant to which seats in both houses of the Colorado Legislature would purportedly be apportioned on a population basis.[4] Amendment *718 No. 7, on the other hand, provided for the apportionment of the House of Representatives on the basis of population, but essentially maintained the existing apportionment in the Senate, which was based on a combination of population and various other factors.
After the 1962 election the parties amended their pleadings so that the cases involved solely a challenge to the apportionment scheme established in the newly adopted Amendment No. 7. Plaintiffs below requested a declaration that Amendment No. 7 was unconstitutional *719 under the Fourteenth Amendment since resulting in substantial disparities from population-based representation in the Senate, and asked for a decree reapportioning both houses of the Colorado Legislature on a population basis. After an extended trial, at which a variety of statistical and testimonial evidence regarding legislative apportionment in Colorado, past and present, was introduced, the District Court, on July 16, 1963, announced its decision on the merits. Lisco v. Love, 219 F. Supp. 922. Splitting 2-to-1, the court below concluded that the apportionment scheme prescribed by Amendment No. 7 comported with the requirements of the Equal Protection Clause, and thus dismissed the consolidated actions. In sustaining the validity of the senatorial apportionment provided for in Amendment No. 7, despite deviations from population-based representation, the District Court stated that the Fourteenth Amendment does not require "equality of population within representation districts for each house of a bicameral state legislature." Finding that the disparities from a population basis in the apportionment of Senate seats were based upon rational considerations, the court below stated that the senatorial apportionment under Amendment No. 7 "recognizes population as a prime, but not controlling, factor and gives effect to such important considerations as geography, compactness and contiguity of territory, accessibility, observance of natural boundaries, [and] conformity to historical divisions such as county lines and prior representation districts . . . ."[5] Stressing also that the apportionment plan had been recently adopted by popular vote in a statewide referendum, the Court stated:
"[Plaintiffs'] argument that the apportionment of the Senate by Amendment No. 7 is arbitrary, invidiously *720 discriminatory, and without any rationality [has been answered by the] voters of Colorado. . . . By adopting Amendment No. 7 and by rejecting Amendment No. 8, which proposed to apportion the legislature on a per capita basis, the electorate has made its choice between the conflicting principles."[6]
Concluding, the District Court stated:
"We believe that no constitutional question arises as to the actual, substantive nature of apportionment if the popular will has expressed itself. . . . In Colorado the liberal provisions for initiation of constitutional *721 amendments permit the people to actโ and they have done so. If they become dissatisfied with what they have done, a workable method of change is available. The people are free, within the framework of the Federal Constitution, to establish the governmental forms which they desire and when they have acted the courts should not enter the political wars to determine the rationality of such action."[7]
In dissenting, District Judge Doyle stated that he regarded the senatorial apportionment under Amendment No. 7 as irrational and invidiously discriminatory, and that the constitutional amendment had not sufficiently remedied the gross disparities previously found by the District Court to exist in Colorado's prior apportionment scheme. Instead, he stated, the adopted plan freezes senatorial apportionment and merely retains the former system with certain minor changes. Equality of voting power in both houses is constitutionally required, the dissent stated, since there is no logical basis for distinguishing between the two bodies of the Colorado Legislature. In rejecting the applicability of the so-called federal analogy, Judge Doyle relied on this Court's decision in Gray v. Sanders, 372 U. S. 368. He concluded that, although absolute equality is a practical impossibility, legislative districting based substantially on population is constitutionally required, and that the disparities in the *722 apportionment of Senate seats under Amendment No. 7's provisions cannot be rationalized.[8]
Notices of appeal from the District Court's decision were timely filed, and we noted probable jurisdiction on December 9, 1963. 375 U. S. 938.

II.
When this litigation was commenced, apportionment of seats in the Colorado General Assembly was based on certain provisions of the State Constitution and statutory provisions enacted to implement them. Article V, ง 45, of the Colorado Constitution provided that the legislature *723 "shall revise and adjust the apportionment for senators and representatives . . . according to ratios to be fixed by law," at the sessions following the state enumeration of inhabitants in 1885 and every 10 years thereafter, and following each decennial federal census. Article V, ง 46, as amended in 1950, stated that "[t]he senate shall consist of not more than thirty-five and the house of not more than sixty-five members." Article V, ง 47, provided that:
"Senatorial and representative districts may be altered from time to time, as public convenience may require. When a senatorial or representative district shall be composed of two or more counties, they shall be contiguous, and the district as compact as may be. No county shall be divided in the formation of a senatorial or representative district."
Article V, ง 3, provides that senators shall be elected for four-year terms, staggered so that approximately one-half of the members of the Senate are elected every two years, and that all representatives shall be elected for two-year terms.
Pursuant to these general constitutional provisions, the Colorado General Assembly has periodically enacted detailed statutory provisions establishing legislative districts and prescribing the apportionment to such districts of seats in both houses of the Colorado Legislature. Since the adoption of the Colorado Constitution in 1876, the General Assembly has been reapportioned or redistricted in the following years: 1881, 1891, 1901, 1909, 1913, 1932, 1953, and, with the adoption of Amendment No. 7, in 1962.[9] The 1932 reapportionment was an initiated *724 measure, adopted because the General Assembly had neglected to perform its duty under the State Constitution. In 1933 the legislature attempted to thwart the initiated measure by enacting its own legislative reapportionment statute, but the latter measure was held unconstitutional by the Colorado Supreme Court.[10]
The 1953 apportionment scheme, implementing the existing state constitutional provisions and in effect immediately prior to the adoption of Amendment No. 7, was contained in several statutory provisions which provided for a 35-member Senate and a 65-member House of Representatives. Section 63-1-2 of the Colorado Revised Statutes established certain population "ratio" figures for the apportionment of Senate and House seats among the State's 63 counties. One Senate seat was to be allocated to each senatorial district for the first 19,000 population, with one additional senator for each senatorial district for each additional 50,000 persons or fraction over 48,000. One House seat was to be given to each representative district for the first 8,000 population, with one *725 additional representative for each House district for each additional 25,000 persons or fraction over 22,400. Sections 63-1-3 and 63-1-6 established 25 senatorial districts and 35 representative districts, respectively, and allocated the 35 Senate seats and 65 House seats among them according to the prescribed population ratios. No counties were divided in the formation of senatorial or representative districts, in compliance with the constitutional proscription. Thus, senators and representatives in those counties entitled to more than one seat in one or both bodies were elected at large by all of the county's voters. The City and County of Denver was given eight Senate seats and 17 House seats, and Pueblo County was allocated two Senate seats and four House seats. Other populous counties were also given more than one Senate and House seat each. Certain counties were entitled to separate representation in either or both of the houses, and were given one seat each. Sparsely populated counties were combined in multicounty districts.
Under the 1953 apportionment scheme, applying 1960 census figures, 29.8% of the State's total population lived in districts electing a majority of the members of the Senate, and 32.1% resided in districts electing a majority of the House members. Maximum population-variance ratios of approximately 8-to-1 existed between the most populous and least populous districts in both the Senate and the House. One senator represented a district containing 127,520 persons, while another senator had only 17,481 people in his district. The smallest representative district had a population of only 7,867, while another district was given only two House seats for a population of 127,520. In discussing the 1953 legislative apportionment scheme, the District Court, in its initial opinion, stated that "[f]actual data presented at the trial reveals the existence of gross and glaring disparity in voting strength as between the several representative and *726 senatorial districts," and that "[t]he inevitable effect . . . [of the existing apportionment provisions] has been to develop severe disparities in voting strength with the growth and shift of population."[11]
Amendment No. 7 provides for the establishment of a General Assembly composed of 39 senators and 65 representatives, with the State divided geographically into 39 senatorial and 65 representative districts, so that all seats in both houses are apportioned among single-member districts.[12] Responsibility for creating House districts "as nearly equal in population as may be" is given to the legislature. Allocation of senators among the counties follows the existing scheme of districting and apportionment, except that one sparsely populated county is detached from populous Arapahoe County and joined with four others in forming a senatorial district, and one additional senator is apportioned to each of the counties of Adams, Arapahoe, Boulder and Jefferson. Within counties given more than one Senate seat, senatorial districts are to be established by the legislature "as nearly equal in population as may be."[13] Amendment No. 7 also provides *727 for a revision of representative districts, and of senatorial districts within counties given more than one Senate seat, after each federal census, in order to maintain conformity with the prescribed requirements.[14] Pursuant to this constitutional mandate, the Colorado Legislature, in early 1963, enacted a statute establishing 65 representative districts and creating senatorial districts in counties given more than one Senate seat.[15] Under the newly adopted House apportionment plan, districts in which about 45.1% of the State's total population reside are represented by a majority of the members of that body. The maximum population-variance ratio, between the most populous and least populous House districts, is approximately 1.7-to-1. The court below concluded that the House was apportioned as nearly on a population basis as was practicable, consistent with Amendment No. 7's requirement that "[n]o part of one county shall be added to another county or part of another county" in the formation of a legislative district, and directed its concern solely to the question of whether the *728 deviations from a population basis in the apportionment of Senate seats were rationally justifiable.[16]
Senatorial apportionment, under Amendment No. 7, involves little more than adding four new Senate seats and distributing them to four populous counties in the Denver area, and in substance perpetuates the existing senatorial apportionment scheme.[17] Counties containing only 33.2% of the State's total population elect a majority of the 39-member Senate under the provisions of Amendment No. 7. Las Animas County, with a 1960 population of only 19,983, is given one Senate seat, while El Paso County, with 143,742 persons, is allotted only two Senate seats. Thus, the maximum population-variance ratio, under the revised senatorial apportionment, is about 3.6-to-1.[18] Denver and the three adjacent suburban *729 counties contain about one-half of the State's total 1960 population of 1,753,947, but are given only 14 out of 39 senators. The Denver, Pueblo, and Colorado Springs metropolitan areas, containing 1,191,832 persons, about 68%, or over two-thirds of Colorado's population, elect only 20 of the State's 39 senators, barely a majority. The average population of Denver's eight senatorial districts, under Amendment No. 7, is 61,736, while the five least populous districts contain less than 22,000 persons each. Divergences from population-based representation in the Senate are growing continually wider, since the underrepresented districts in the Denver, Pueblo, and Colorado Springs metropolitan areas are rapidly gaining in population, while many of the overrepresented rural districts have tended to decline in population continuously in recent years.[19]

*730 III.
Several aspects of this case serve to distinguish it from the other cases involving state legislative apportionment also decided this date. Initially, one house of the Colorado Legislature is at least arguably apportioned substantially on a population basis under Amendment No. 7 and the implementing statutory provisions. Under the apportionment schemes challenged in the other cases, on the other hand, clearly neither of the houses in any of the state legislatures is apportioned sufficiently on a population basis so as to be constitutionally sustainable. Additionally, the Colorado scheme of legislative apportionment here attacked is one adopted by a majority vote of the Colorado electorate almost contemporaneously with the District Court's decision on the merits in this litigation. Thus, the plan at issue did not result from prolonged legislative inaction. However, the Colorado General Assembly, in spite of the state constitutional mandate for periodic reapportionment, has enacted only one effective legislative apportionment measure in the past 50 years.[20]
*731 As appellees have correctly pointed out, a majority of the voters in every county of the State voted in favor of the apportionment scheme embodied in Amendment No. 7's provisions, in preference to that contained in proposed Amendment No. 8, which, subject to minor deviations, would have based the apportionment of seats in both houses on a population basis. However, the choice presented to the Colorado electorate, in voting on these two proposed constitutional amendments, was hardly as clear-cut as the court below regarded it. One of the most undesirable features of the existing apportionment scheme was the requirement that, in counties given more than one seat in either or both of the houses of the General Assembly, all legislators must be elected at large from the county as a whole. Thus, under the existing plan, each Denver voter was required to vote for eight senators and 17 representatives. Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies within the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multimember county represented the county as a whole.[21] Amendment No. 8, as distinguished from Amendment No. 7, while purportedly basing the apportionment of *732 seats in both houses on a population basis, would have perpetuated, for all practical purposes, this debatable feature of the existing scheme. Under Amendment No. 8, senators were to be elected at large in those counties given more than one Senate seat, and no provision was made for subdistricting within such counties for the purpose of electing senators. Representatives were also to be elected at large in multimember counties pursuant to the provisions of Amendment No. 8, at least initially, although subdistricting for the purpose of electing House members was permitted if the voters of a multimember county specifically approved a representative subdistricting plan for that county. Thus, neither of the proposed plans was, in all probability, wholly acceptable to the voters in the populous counties, and the assumption of the court below that the Colorado voters made a definitive choice between two contrasting alternatives and indicated that "minority process in the Senate is what they want" does not appear to be factually justifiable.
Finally, this case differs from the others decided this date in that the initiative device provides a practicable political remedy to obtain relief against alleged legislative malapportionment in Colorado.[22] An initiated *733 measure proposing a constitutional amendment or a statutory enactment is entitled to be placed on the ballot if the signatures of 8% of those voting for the Secretary of State in the last election are obtained. No geographical distribution of petition signers is required. Initiative and referendum has been frequently utilized throughout Colorado's history.[23] Additionally, Colorado courts have traditionally not been hesitant about adjudicating controversies relating to legislative apportionment.[24] However, *734 the Colorado Supreme Court, in its 1962 decision discussed previously in this opinion,[25] refused to consider or pass upon the federal constitutional questions, but instead held only that the Colorado General Assembly was not required to enact a reapportionment statute until the following legislative session.[26]

IV.
In Reynolds v. Sims, ante, p. 533, decided also this date, we held that the Equal Protection Clause requires that both houses of a bicameral state legislature must be apportioned substantially on a population basis. Of course, the court below assumed, and the parties apparently conceded, that the Colorado House of Representatives, under the statutory provisions enacted by the Colorado Legislature in early 1963 pursuant to Amendment No. 7's dictate that the legislature should create 65 House districts "as nearly equal in population as may be," is now apportioned sufficiently on a population basis to comport with federal constitutional requisites. We need not pass on this question, since the apportionment of Senate seats, under Amendment No. 7, clearly involves departures from population-based representation too *735 extreme to be constitutionally permissible, and there is no indication that the apportionment of the two houses of the Colorado General Assembly, pursuant to the 1962 constitutional amendment, is severable.[27] We therefore conclude that the District Court erred in holding the legislative apportionment plan embodied in Amendment No. 7 to be constitutionally valid. Under neither Amendment No. 7's plan, nor, of course, the previous statutory scheme, is the overall legislative representation in the two houses of the Colorado Legislature sufficiently grounded on population to be constitutionally sustainable under the Equal Protection Clause.[28]
*736 Except as an interim remedial procedure justifying a court in staying its hand temporarily, we find no significance in the fact that a nonjudicial, political remedy may be available for the effectuation of asserted rights to equal representation in a state legislature. Courts sit to adjudicate controversies involving alleged denials of constitutional rights. While a court sitting as a court of equity might be justified in temporarily refraining from the issuance of injunctive relief in an apportionment case in order to allow for resort to an available political remedy, such as initiative and referendum, individual constitutional rights cannot be deprived, or denied judicial effectuation, because of the existence of a nonjudicial remedy through which relief against the alleged malapportionment, which the individual voters seek, might be achieved. An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate, if the apportionment scheme adopted by the voters fails to measure up to the requirements of the Equal Protection Clause. Manifestly, the fact that an apportionment plan is adopted in a popular referendum is insufficient to sustain its constitutionality or to induce a court of equity to refuse to act. As stated by this Court in West Virginia State Bd. of Educ. v. Barnette, 319 U. S. 624, 638, "One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."[29] A citizen's constitutional rights can hardly be infringed simply because a majority *737 of the people choose that it be.[30] We hold that the fact that a challenged legislative apportionment plan was approved by the electorate is without federal constitutional significance, if the scheme adopted fails to satisfy the basic requirements of the Equal Protection Clause, as delineated in our opinion in Reynolds v. Sims. And we conclude that the fact that a practicably available political remedy, such as initiative and referendum, exists under state law provides justification only for a court of equity to stay its hand temporarily while recourse to such a remedial device is attempted or while proposed initiated measures relating to legislative apportionment are pending and will be submitted to the State's voters at the next election.
*738 Because of the imminence of the November 1962 election, and the fact that two initiated proposals relating to legislative apportionment would be voted on by the State's electorate at that election, the District Court properly stayed its hand and permitted the 1962 election of legislators to be conducted pursuant to the existing statutory scheme. But appellees' argument, accepted by the court below, that the apportionment of the Colorado Senate, under Amendment No. 7, is rational because it takes into account a variety of geographical, historical, topographic and economic considerations fails to provide an adequate justification for the substantial disparities from population-based representation in the allocation of Senate seats to the disfavored populous areas.[31] And any attempted reliance on the so-called federal analogy is factually as well as constitutionally without merit.[32]
*739 Since the apportionment of seats in the Colorado Legislature, under the provisions of Amendment No. 7, fails to comport with the requirements of the Equal Protection Clause, the decision below must be reversed. Beyond what we said in our opinion in Reynolds,[33] we express no view on questions relating to remedies at the present time. On remand, the District Court must now determine whether the imminence of the 1964 primary and general elections requires that utilization of the apportionment scheme contained in the constitutional amendment be permitted, for purposes of those elections, or whether the circumstances in Colorado are such that appellants' right to cast adequately weighted votes for members of the State Legislature can practicably be effectuated in 1964. Accordingly, we reverse the decision of the court below and remand the case for further proceedings consistent with the views stated here and in our opinion in Reynolds v. Sims.
It is so ordered.

APPENDIX TO OPINION OF THE COURT.
Amendment No. 7, approved by a vote of the Colorado electorate in November 1962, appears in Colo. Laws 1963, c. 312, p. 1045 et seq., and, in relevant part, provides as follows:
"Sections 45, 46, and 47 of Article V of the Constitution of the State of Colorado are hereby repealed *740 and new Sections 45, 46, 47 and 48 of Article V are adopted, to read as follows:
"Section 45. GENERAL ASSEMBLY. The general assembly shall consist of 39 members of the senate and 65 members of the house, one to be elected from each senatorial and representative district. Districts of the same house shall not overlap. All districts shall be as compact as may be and shall consist of contiguous whole general election precincts. No part of one county shall be added to another county or part of another county in forming a district. When a district includes two or more counties they shall be contiguous.
"Section 46. HOUSE OF REPRESENTATIVES. The state shall be divided into 65 representative districts which shall be as nearly equal in population as may be.
"Section 47. SENATE. The state shall be divided into 39 senatorial districts. The apportionment of senators among the counties shall be the same as now provided by 63-1-3 of Colorado Revised Statutes 1953, which shall not be repealed or amended other than in numbering districts, except that the counties of Cheyenne, Elbert, Kiowa, Kit Carson and Lincoln shall form one district, and one additional senator is hereby apportioned to each of the counties of Adams, Arapahoe, Boulder and Jefferson. Within a county to which there is apportioned more than one senator, senatorial districts shall be as nearly equal in population as may be.
"Section 48. REVISION OF DISTRICTS. At the regular session of the general assembly of 1963 and each regular session next following official publication of each Federal enumeration of the population of the state, the general assembly shall immediately alter and amend the boundaries of all *741 representative districts and of those senatorial districts within any county to which there is apportioned more than one senator to conform to the requirements of Sections 45, 46 and 47 of this Article V. After 45 days from the beginning of each such regular session, no member of the general assembly shall be entitled to or earn any compensation or receive any payments on account of salary or expenses, and the members of any general assembly shall be ineligible for election to succeed themselves in office, until such revisions have been made. Until the completion of the terms of the representatives elected at the general election held in November of 1962 shall have expired, the apportionment of senators and representatives and the senatorial and representative districts of the general assembly shall be as provided by law."
[For dissenting opinion of MR. JUSTICE HARLAN, see ante, p. 589.]
MR. JUSTICE CLARK, dissenting.
While I join my Brother STEWART'S opinion, I have some additional observations with reference to this case.
The parties concede that the Colorado House of Representatives is now apportioned "as nearly equal in population as may be." The Court does not disturb this stipulation though it seems to accept it in niggardly fashion. The fact that 45.1% of the State's population resides in the area which selects a majority of the House indicates rather conclusively that the apportionment comes within the test laid down in Reynolds v. Sims, ante, p. 533, decided this date, viz.: " `one person, one vote,' " that is, "approximately equal" or " `as nearly as is practicable' " with only "some deviations . . . ." Indeed, the Colorado House is within 4.9% of being perfect. *742 Moreover, the fact that the apportionment follows political subdivision lines to some extent is also a teaching of Reynolds v. Sims, supra. But the Court strikes down Colorado's apportionment, which was adopted by the majority vote of every political subdivision in the State, because the Senate's majority is elected by 33.2% of the population, a much higher percentage than that which elects a majority of the Senate of the United States.
I would refuse to interfere with this apportionment for several reasons. First, Colorado enjoys the initiative and referendum system which it often utilizes and which, indeed, produced the present apportionment. As a result of the action of the Legislature and the use of initiative and referendum, the State Assembly has been reapportioned eight times since 1881. This indicates the complete awareness of the people of Colorado to apportionment problems and their continuing efforts to solve them. The courts should not interfere in such a situation. See my concurring opinion in Baker v. Carr, 369 U. S. 186, 258-259 (1962). Next, as my Brother STEWART has pointed out, there are rational and most persuasive reasons for some deviations in the representation in the Colorado Assembly. The State has mountainous areas which divide it into four regions, some parts of which are almost impenetrable. There are also some depressed areas, diversified industry and varied climate, as well as enormous recreational regions and difficulties in transportation. These factors give rise to problems indigenous to Colorado, which only its people can intelligently solve. This they have done in the present apportionment.
Finally, I cannot agree to the arbitrary application of the "one man, one vote" principle for both houses of a State Legislature. In my view, if one house is fairly apportioned by population (as is admitted here) then the people should have some latitude in providing, on a rational basis, for representation in the other house. The *743 Court seems to approve the federal arrangement of two Senators from each State on the ground that it was a compromise reached by the framers of our Constitution and is a part of the fabric of our national charter. But what the Court overlooks is that Colorado, by an overwhelming vote, has likewise written the organization of its legislative body into its Constitution,[*] and our dual federalism requires that we give it recognition. After all, the Equal Protection Clause is not an algebraic formula. Equal protection does not rest on whether the practice assailed "results in some inequality" but rather on whether "any state of facts reasonably can be conceived that would sustain it"; and one who attacks it must show "that it does not rest upon any reasonable basis, but is essentially arbitrary." Mr. Justice Van Devanter in Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78-79 (1911). Certainly Colorado's arrangement is not arbitrary. On the contrary, it rests on reasonable grounds which, as I have pointed out, are peculiar to that State. It is argued that the Colorado apportionment would lead only to a legislative stalemate between the two houses, but the experience of the Congress completely refutes this argument. Now in its 176th year, the federal plan has worked well. It is further said that in any event Colorado's apportionment would substitute compromise for the legislative process. But most legislation is the product of compromise between the various forces acting for and against its enactment.
In striking down Colorado's plan of apportionment, the Court, I believe, is exceeding its powers under the Equal Protection Clause; it is invading the valid functioning of *744 the procedures of the States, and thereby is committing a grievous error which will do irreparable damage to our federal-state relationship. I dissent.
MR. JUSTICE STEWART, whom MR. JUSTICE CLARK joins, dissenting.[*]
It is important to make clear at the outset what these cases are not about. They have nothing to do with the denial or impairment of any person's right to vote. Nobody's right to vote has been denied. Nobody's right to vote has been restricted. Nobody has been deprived of the right to have his vote counted. The voting right cases which the Court cites are, therefore, completely wide of the mark.[1] Secondly, these cases have nothing to do with the "weighting" or "diluting" of votes cast within any electoral unit. The rule of Gray v. Sanders, 372 U. S. 368, is, therefore, completely without relevance here.[2] Thirdly, these cases are not concerned with the election of members of the Congress of the United States, governed by Article I of the Constitution. Consequently, *745 the Court's decision in Wesberry v. Sanders, 376 U. S. 1, throws no light at all on the basic issue now before us.[3]
The question involved in these cases is quite a different one. Simply stated, the question is to what degree, if at all, the Equal Protection Clause of the Fourteenth Amendment limits each sovereign State's freedom to establish appropriate electoral constituencies from which representatives to the State's bicameral legislative assembly are to be chosen. The Court's answer is a blunt one, and, I think, woefully wrong. The Equal Protection Clause, says the Court, "requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."[4]
After searching carefully through the Court's opinions in these and their companion cases, I have been able to find but two reasons offered in support of this rule. First, says the Court, it is "established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people . . . ."[5] With all respect, I think that this is not correct, simply as a matter of fact. It has been unanswerably demonstrated before now that this "was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominantly practiced by the States at the time of adoption of the Fourteenth Amendment, it is not predominantly practiced by the *746 States today."[6] Secondly, says the Court, unless legislative districts are equal in population, voters in the more populous districts will suffer a "debasement" amounting to a constitutional injury. As the Court explains it, "To the extent that a citizen's right to vote is debased, he is that much less a citizen."[7] We are not told how or why the vote of a person in a more populated legislative district is "debased," or how or why he is less a citizen, nor is the proposition self-evident. I find it impossible to understand how or why a voter in California, for instance, either feels or is less a citizen than a voter in Nevada, simply because, despite their population disparities, each of those States is represented by two United States Senators.[8]
To put the matter plainly, there is nothing in all the history of this Court's decisions which supports this constitutional rule. The Court's draconian pronouncement, which makes unconstitutional the legislatures of most of the 50 States, finds no support in the words of the Constitution, in any prior decision of this Court, or in the 175-year political history of our Federal Union.[9] With *747 all respect, I am convinced these decisions mark a long step backward into that unhappy era when a majority of the members of this Court were thought by many to have convinced themselves and each other that the demands of the Constitution were to be measured not by what it says, *748 but by their own notions of wise political theory. The rule announced today is at odds with long-established principles of constitutional adjudication under the Equal Protection Clause, and it stifles values of local individuality and initiative vital to the character of the Federal Union which it was the genius of our Constitution to create.

I.
What the Court has done is to convert a particular political philosophy into a constitutional rule, binding upon each of the 50 States, from Maine to Hawaii, from Alaska to Texas, without regard and without respect for the many individualized and differentiated characteristics of each State, characteristics stemming from each State's distinct history, distinct geography, distinct distribution of population, and distinct political heritage. My own understanding of the various theories of representative government is that no one theory has ever commanded unanimous assent among political scientists, historians, or others who have considered the problem.[10] But even if it were thought that the rule announced today by the Court is, as a matter of political theory, the most desirable general rule which can be devised as a basis for the make-up of the representative assembly of a typical State, I could not join in the fabrication of a constitutional mandate which imports and forever freezes one theory of political thought into our Constitution, and forever denies to every State any opportunity for enlightened and progressive innovation in the design of its democratic institutions, so as to accommodate within a system *749 of representative government the interests and aspirations of diverse groups of people, without subjecting any group or class to absolute domination by a geographically concentrated or highly organized majority.
Representative government is a process of accommodating group interests through democratic institutional arrangements. Its function is to channel the numerous opinions, interests, and abilities of the people of a State into the making of the State's public policy. Appropriate legislative apportionment, therefore, should ideally be designed to insure effective representation in the State's legislature, in cooperation with other organs of political power, of the various groups and interests making up the electorate. In practice, of course, this ideal is approximated in the particular apportionment system of any State by a realistic accommodation of the diverse and often conflicting political forces operating within the State.
I do not pretend to any specialized knowledge of the myriad of individual characteristics of the several States, beyond the records in the cases before us today. But I do know enough to be aware that a system of legislative apportionment which might be best for South Dakota, might be unwise for Hawaii with its many islands, or Michigan with its Northern Peninsula. I do know enough to realize that Montana with its vast distances is not Rhode Island with its heavy concentrations of people. I do know enough to be aware of the great variations among the several States in their historic manner of distributing legislative powerโof the Governors' Councils in New England, of the broad powers of initiative and referendum retained in some States by the people, of the legislative power which some States give to their Governors, by the right of veto or otherwise, of the widely autonomous home rule which many States give to their *750 cities.[11] The Court today declines to give any recognition to these considerations and countless others, tangible and intangible, in holding unconstitutional the particular systems of legislative apportionment which these States have chosen. Instead, the Court says that the requirements of the Equal Protection Clause can be met in any State only by the uncritical, simplistic, and heavy-handed application of sixth-grade arithmetic.
But legislators do not represent faceless numbers. They represent people, or, more accurately, a majority of the voters in their districtsโpeople with identifiable needs and interests which require legislative representation, and which can often be related to the geographical areas in which these people live. The very fact of geographic districting, the constitutional validity of which the Court does not question, carries with it an acceptance of the idea of legislative representation of regional needs and interests. Yet if geographical residence is irrelevant, as the Court suggests, and the goal is solely that of equally "weighted" votes, I do not understand why the Court's constitutional rule does not require the abolition of districts and the holding of all elections at large.[12]
*751 The fact is, of course, that population factors must often to some degree be subordinated in devising a legislative apportionment plan which is to achieve the important goal of ensuring a fair, effective, and balanced representation of the regional, social, and economic interests within a State. And the further fact is that throughout our history the apportionments of State Legislatures have reflected the strongly felt American tradition that the public interest is composed of many diverse interests, and that in the long run it can better be expressed by a medley of component voices than by the majority's monolithic command. What constitutes a rational plan reasonably designed to achieve this objective will vary from State to State, since each State is unique, in terms of topography, geography, demography, history, heterogeneity and concentration of population, variety of social and economic interests, and in the operation and inter-relation of its political institutions. But so long as a State's apportionment plan reasonably achieves, in the light of the State's own characteristics, effective and balanced representation of all substantial interests, without sacrificing the principle of effective majority rule, that plan cannot be considered irrational.

II.
This brings me to what I consider to be the proper constitutional standards to be applied in these cases. Quite simply, I think the cases should be decided by application of accepted principles of constitutional adjudication under the Equal Protection Clause. A recent expression by the Court of these principles will serve as a generalized compendium:
"[T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the *752 classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U. S. 420, 425-426.
These principles reflect an understanding respect for the unique values inherent in the Federal Union of States established by our Constitution. They reflect, too, a wise perception of this Court's role in that constitutional system. The point was never better made than by Mr. Justice Brandeis, dissenting in New State Ice Co. v. Liebmann, 285 U. S. 262, 280. The final paragraph of that classic dissent is worth repeating here:
"To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. . . . But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold." 285 U. S., at 311.
That cases such as the ones now before us were to be decided under these accepted Equal Protection Clause *753 standards was the clear import of what was said on this score in Baker v. Carr, 369 U. S. 186, 226:
"Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action."
It is to be remembered that the Court in Baker v. Carr did not question what had been said only a few years earlier in MacDougall v. Green, 335 U. S. 281, 284:
"It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution โa practical instrument of governmentโmakes no such demands on the States."
Moving from the general to the specific, I think that the Equal Protection Clause demands but two basic attributes of any plan of state legislative apportionment. First, it demands that, in the light of the State's own characteristics and needs, the plan must be a rational one. Secondly, it demands that the plan must be such as not to permit the systematic frustration of the will of a majority *754 of the electorate of the State.[13] I think it is apparent that any plan of legislative apportionment which could be shown to reflect no policy, but simply arbitrary and capricious action or inaction, and that any plan which could be shown systematically to prevent ultimate effective majority rule, would be invalid under accepted Equal Protection Clause standards. But, beyond this, I think there is nothing in the Federal Constitution to prevent a State from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people. In the light of these standards, I turn to the Colorado and New York plans of legislative apportionment.

III.

COLORADO.
The Colorado plan creates a General Assembly composed of a Senate of 39 members and a House of 65 members. The State is divided into 65 equal population representative districts, with one representative to be elected from each district, and 39 senatorial districts, 14 of which include more than one county. In the Colorado House, the majority unquestionably rules supreme, with the population factor untempered by other considerations. In *755 the Senate rural minorities do not have effective control, and therefore do not have even a veto power over the will of the urban majorities. It is true that, as a matter of theoretical arithmetic, a minority of 36% of the voters could elect a majority of the Senate, but this percentage has no real meaning in terms of the legislative process.[14] Under the Colorado plan, no possible combination of Colorado senators from rural districts, even assuming arguendo that they would vote as a bloc, could control the Senate. To arrive at the 36% figure, one must include with the rural districts a substantial number of urban districts, districts with substantially dissimilar interests. There is absolutely no reason to assume that this theoretical majority would ever vote together on any issue so as to thwart the wishes of the majority of the voters of Colorado. Indeed, when we eschew the world of numbers, and look to the real world of effective representation, the simple fact of the matter is that Colorado's three metropolitan areas, Denver, Pueblo, and Colorado Springs, elect a majority of the Senate.
The State of Colorado is not an economically or geographically homogeneous unit. The Continental Divide crosses the State in a meandering line from north to south, and Colorado's 104,247 square miles of area are almost *756 equally divided between high plains in the east and rugged mountains in the west. The State's population is highly concentrated in the urbanized eastern edge of the foothills, while farther to the east lies that agricultural area of Colorado which is a part of the Great Plains. The area lying to the west of the Continental Divide is largely mountainous, with two-thirds of the population living in communities of less than 2,500 inhabitants or on farms. Livestock raising, mining and tourism are the dominant occupations. This area is further subdivided by a series of mountain ranges containing some of the highest peaks in the United States, isolating communities and making transportation from point to point difficult, and in some places during the winter months almost impossible. The fourth distinct region of the State is the South Central region, in which is located the most economically depressed area in the State. A scarcity of water makes a state-wide water policy a necessity, with each region affected differently by the problem.
The District Court found that the people living in each of these four regions have interests unifying themselves and differentiating them from those in other regions. Given these underlying facts, certainly it was not irrational to conclude that effective representation of the interests of the residents of each of these regions was unlikely to be achieved if the rule of equal population districts were mechanically imposed; that planned departures from a strict per capita standard of representation were a desirable way of assuring some representation of distinct localities whose needs and problems might have passed unnoticed if districts had been drawn solely on a per capita basis; a desirable way of assuring that districts should be small enough in area, in a mountainous State like Colorado, where accessibility is affected by configuration as well as compactness of districts, to enable each *757 senator to have firsthand knowledge of his entire district and to maintain close contact with his constituents; and a desirable way of avoiding the drawing of district lines which would submerge the needs and wishes of a portion of the electorate by grouping them in districts with larger numbers of voters with wholly different interests.
It is clear from the record that if per capita representation were the rule in both houses of the Colorado Legislature, counties having small populations would have to be merged with larger counties having totally dissimilar interests.. Their representatives would not only be unfamiliar with the problems of the smaller county, but the interests of the smaller counties might well be totally submerged by the interests of the larger counties with which they are joined. Since representatives representing conflicting interests might well pay greater attention to the views of the majority, the minority interest could be denied any effective representation at all. Its votes would not be merely "diluted," an injury which the Court considers of constitutional dimensions, but rendered totally nugatory.
The findings of the District Court speak for themselves:
"The heterogeneous characteristics of Colorado justify geographic districting for the election of the members of one chamber of the legislature. In no other way may representation be afforded to insular minorities. Without such districting the metropolitan areas could theoretically, and no doubt practically, dominate both chambers of the legislature.
". . . The realities of topographic conditions with their resulting effect on population may not be ignored. For an example, if [the rule of equal population districts] was to be accepted, Colorado would have one senator for approximately every 45,000 persons. Two contiguous Western Region senatorial *758 districts, Nos. 29 and 37, have a combined population of 51,675 persons inhabiting an area of 20,514 square miles. The division of this area into two districts does not offend any constitutional provisions. Rather, it is a wise recognition of the practicalities of life. . . .
"We are convinced that the apportionment of the Senate by Amendment No. 7 recognizes population as a prime, but not controlling, factor and gives effect to such important considerations as geography, compactness and contiguity of territory, accessibility, observance of natural boundaries, conformity to historical divisions such as county lines and prior representation districts, and `a proper diffusion of political initiative as between a state's thinly populated counties and those having concentrated masses.' " 219 F. Supp., at 932.
From 1954 until the adoption of Amendment 7 in 1962, the issue of apportionment had been the subject of intense public debate. The present apportionment was proposed and supported by many of Colorado's leading citizens. The factual data underlying the apportionment were prepared by the wholly independent Denver Research Institute of the University of Denver. Finally, the apportionment was adopted by a popular referendum in which not only a 2-1 majority of all the voters in Colorado, but a majority in each county, including those urban counties allegedly discriminated against, voted for the present plan in preference to an alternative proposal providing for equal representation per capita in both legislative houses. As the District Court said:
"The contention that the voters have discriminated against themselves appalls rather than convinces. Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of *759 the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary." Ibid.

The present apportionment, adopted overwhelmingly by the people in a 1962 popular referendum as a state constitutional amendment, is entirely rational, and the amendment by its terms provides for keeping the apportionment current.[15] Thus the majority has consciously chosen to protect the minority's interests, and under the liberal initiative provisions of the Colorado Constitution, it retains the power to reverse its decision to do so. Therefore, there can be no question of frustration of the basic principle of majority rule.

IV.

NEW YORK.
". . . Constitutional statecraft often involves a degree of protection for minorities which limits the principle of majority rule. Perfect numerical equality in voting rights would be achieved if an entire State legislature were elected at large but the danger is too great that the remote and less populated sections would be neglected or that, in the event of a conflict between two parts of the State, the more populous region would elect the entire legislature and in its councils the minority would never be heard.
"Due recognition of geographic and other minority interests is also a comprehensible reason for reducing the weight of votes in great cities. If seventy percent of a State's population lived in a single city and the remainder *760 was scattered over wide country areas and small towns, it might be reasonable to give the city voters somewhat smaller representation than that to which they would be entitled by a strictly numerical apportionment in order to reduce the danger of total neglect of the needs and wishes of rural areas."
The above two paragraphs are from the brief which the United States filed in Baker v. Carr, 369 U. S. 186.[16] It would be difficult to find words more aptly to describe the State of New York, or more clearly to justify the system of legislative apportionment which that State has chosen.
Legislative apportionment in New York follows a formula which is written into the New York Constitution and which has been a part of its fundamental law since 1894. The apportionment is not a crazy quilt; it is rational, it is applied systematically, and it is kept reasonably current. The formula reflects a policy which accords major emphasis to population, some emphasis to region and community, and a reasonable limitation upon massive overcentralization of power. In order to effectuate this policy, the apportionment formula provides that each county shall have at least one representative in the Assembly, that the smaller counties shall have somewhat greater representation in the legislature than representation based solely on numbers would accord, and that some limits be placed on the representation of the largest *761 counties in order to prevent one megalopolis from completely dominating the legislature.
New York is not unique in considering factors other than population in its apportionment formula. Indeed, the inclusion of such other considerations is more the rule than the exception throughout the States. Two-thirds of the States have given effect to factors other than population in apportioning representation in both houses of their legislatures, and over four-fifths of the States give effect to nonpopulation factors in at least one house.[17] The typical restrictions are those like New York's affording minimal representation to certain political subdivisions, or prohibiting districts composed of parts of two or more counties, or requiring districts to be composed of contiguous and compact territory, or fixing the membership of the legislative body. All of these factors tend to place practical limitations on apportionment according to population, even if the basic underlying system is one of equal population districts for representation in one or both houses of the legislature.
That these are rational policy considerations can be seen from even a cursory examination of New York's political makeup. In New York many of the interests which a citizen may wish to assert through the legislative process are interests which touch on his relation to the government of his county as well as to that of the State, and consequently these interests are often peculiar to the citizens of one county. As the District Court found, counties have been an integral part of New York's governmental structure since early colonial times, and the many functions performed by the counties today reflect both the historic gravitation toward the county as the central unit of political activity and the realistic fact that *762 the county is usually the most efficient and practical unit for carrying out many governmental programs.[18]
A policy guaranteeing minimum representation to each county is certainly rational, particularly in a State like New York. It prevents less densely populated counties from being merged into multicounty districts where they would receive no effective representation at all. Further, it may be only by individual county representation that the needs and interests of all the areas of the State can be brought to the attention of the legislative body. The rationality of individual county representation becomes *763 particularly apparent in States where legislative action applicable only to one or more particular counties is the permissible tradition.
Despite the rationality of according at least one representative to each county, it is clear that such a system of representation, coupled with a provision fixing the maximum number of members in the legislative bodyโa necessity if the body is to remain small enough for manageably effective actionโhas the result of creating some population disparities among districts. But since the disparity flows from the effectuation of a rational state policy, the mere existence of the disparity itself can hardly be considered an invidious discrimination.
In addition to ensuring minimum representation to each county, the New York apportionment formula, by allocating somewhat greater representation to the smaller counties while placing limitations on the representation of the largest counties, is clearly designed to protect against overcentralization of power. To understand fully the practical importance of this consideration in New York, one must look to its unique characteristics. New York is one of the few States in which the central cities can elect a majority of representatives to the legislature. As the District Court found, the 10 most populous counties in the State control both houses of the legislature under the existing apportionment system. Each of these counties is heavily urban; each is in a metropolitan area. Together they contain 73.5% of the citizen population, and are represented by 65.5% of the seats in the Senate and 62% of the seats in the Assembly. Moreover, the nine counties comprising one metropolitan areaโNew York City, Nassau, Rockland, Suffolk and Westchesterโcontain 63.2% of the total citizen population and elect a clear majority of both houses of the legislature under the existing system which the Court today holds invalid. Obviously, therefore, the existing *764 system of apportionment clearly guarantees effective majority representation and control in the State Legislature.
But this is not the whole story. New York City, with its seven million people and a budget larger than that of the State, has, by virtue of its concentration of population, homogeneity of interest, and political cohesiveness, acquired an institutional power and political influence of its own hardly measurable simply by counting the number of its representatives in the legislature. Elihu Root, a delegate to the New York Constitutional Convention of 1894, which formulated the basic structure of the present apportionment plan, made this very point at that time:
"The question is whether thirty separate centers of 38,606 each scattered over the country are to be compared upon the basis of absolute numerical equality with one center of thirty times 38,606 in one city, with all the multiplications of power that comes from representing a single interest, standing together on all measures against a scattered and disunited representation from the thirty widely separated single centers of 38,606. Thirty men from one place owing their allegiance to one political organization, representing the interest of one community, voting together, acting together solidly; why, they are worth double the scattered elements of power coming from hundreds of miles apart." 3 Revised Record of the New York State Constitutional Convention of 1894, p. 1215.
Surely it is not irrational for the State of New York to be justifiably concerned about balancing such a concentration of political power, and certainly there is nothing in our Federal Constitution which prevents a State from reasonably translating such a concern into its apportionment formula. See MacDougall v. Green, 335 U. S. 281.
*765 The State of New York is large in area and diverse in interests. The Hudson and Mohawk Valleys, the farm communities along the southern belt, the many suburban areas throughout the State, the upstate urban and industrial centers, the Thousand Islands, the Finger Lakes, the Berkshire Hills, the Adirondacksโthe people of all these and many other areas, with their aspirations and their interests, just as surely belong to the State as does the giant metropolis which is New York City. What the State has done is to adopt a plan of legislative apportionment which is designed in a rational way to ensure that minority voices may be heard, but that the will of the majority shall prevail.

V.
In the allocation of representation in their State Legislatures, Colorado and New York have adopted completely rational plans which reflect an informed response to their particularized characteristics and needs. The plans are quite different, just as Colorado and New York are quite different. But each State, while clearly ensuring that in its legislative councils the will of the majority of the electorate shall rule, has sought to provide that no identifiable minority shall be completely silenced or engulfed. The Court today holds unconstitutional the considered governmental choices of these two sovereign States. By contrast, I believe that what each State has achieved fully comports with the letter and the spirit of our constitutional traditions.
I would affirm the judgments in both cases.
NOTES
[1] Colo. Rev. Stat. 1953, c. 63, งง 63-1-1โ63-1-6.
[2] The District Court wisely refrained from acting at all until a case pending in the Colorado Supreme Court was decided without that court's passing on the federal constitutional questions relating to Colorado's scheme of legislative apportionment which were raised in that suit. In re Legislative Reapportionment, 150 Colo. 380, 374 P. 2d 66 (1962). After accepting jurisdiction, the Colorado Supreme Court, over a vigorous dissent, ignored the federal constitutional issues and instead discussed only the matter of when the Colorado Legislature was required, pursuant to the State Constitution, to reapportion seats in the General Assembly. The Court concluded that a reapportionment measure enacted during the 1963 session of the Colorado Legislature, on the basis of 1960 census figures, would, if neither of the proposed constitutional amendments relating to legislative apportionment was approved by the voters in November 1962, be in sufficient compliance with the constitutional requirement of periodic legislative reapportionment. See also 208 F. Supp., at 474, discussing the Colorado Supreme Court's decision in that case.
[3] In its initial opinion, the District Court properly concluded that the argument that "the Colorado Supreme Court has preempted jurisdiction by first hearing the controversy, is without merit in view of the fact that the Supreme Court of Colorado has refrained from even considering the issue of infringement of the plaintiffs' federally-guaranteed constitutional rights." 208 F. Supp., at 475. Continuing, the court below correctly held that, under the circumstances, it was not required to abstain, and stated:

"The considerations which demand abstinence are not present in the instant case. Here, the General Assembly of the State of Colorado has repeatedly refused to perform the mandate imposed by the Colorado Constitution to apportion the legislature. The likelihood that the unapportioned General Assembly will ever apportion itself now appears remote. The Supreme Court of Colorado, while retaining jurisdiction of the subject matter of the controversy presented to it, has postponed further consideration of the cause until June, 1963. Under these circumstances, we must conclude that the parties do not, at least at present, have an adequate, speedy and complete remedy apart from that asserted in the case at bar and thus grounds for abstention are at this time lacking." 208 F. Supp., at 476. See also Davis v. Mann, ante, pp. 690-691, decided also this date, where we discussed the question of abstention by a federal court in a state legislative apportionment controversy.
[4] As stated succinctly by the District Court, in its opinion on the merits,

"The defeated Amendment No. 8 proposed a three-man commission to apportion the legislature periodically. The commission was to have the duty of delineating, revising and adjusting senatorial and representative districts. Its actions were to be reviewed by the Colorado Supreme Court. The districting was to be on a strict population ratio for both the Senate and the House with limited permissible variations therefrom." 219 F. Supp., at 925.
Additionally, under proposed Amendment No. 8, the commission would determine a strict population ratio for both the Senate and the House by dividing the State's total population, as ascertained in each decennial federal census, by the number of seats assigned to the Senate and the House, respectively. No legislative district should contain a population per senator or representative of 33 1/3% more or less than the strict population ratio, except certain mountainous senatorial districts of more than 5,500 square miles in area, but no senatorial district was to contain a population of less than 50% of the strict population ratio. Senatorial districts should consist of one county or two or more contiguous counties, but no county should be divided in the formation of a senatorial district. Representative districts should consist of one county or two or more contiguous counties. Any county apportioned two or more representatives could be divided into representative subdistricts, but only after a majority of the voters in the county had approved, in a general election, the exact method of subdivision and the specific apportionment of representatives among the subdistricts and the county at large. A proposal to divide a county into subdistricts could be placed on the ballot only by initiative petition in accordance with state law, and only at the general elections in 1966 and 1974, and at the general elections held each 10 years thereafter. Amendment No. 8, like Amendment No. 7, would have required implementing legislation and would not have become effective, if adopted, until the 1964 elections.
[5] 219 F. Supp., at 932.
[6] Ibid. Continuing, the court below stated:

"The initiative gives the people of a state no power to adopt a constitutional amendment which violates the Federal Constitution. Amendment No. 7 is not valid just because the people voted for it. . . . [But] the traditional and recognized criteria of equal protection. . . are arbitrariness, discrimination, and lack of rationality. The actions of the electorate are material to the application of the criteria. The contention that the voters have discriminated against themselves appalls rather than convinces. Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary.
"The electorate of every county from which the plaintiffs come preferred Amendment No. 7. In the circumstances it is difficult to comprehend how the plaintiffs can sue to vindicate a public right. At the most they present a political issue which they lost. On the questions before us we shall not substitute any views which we may have for the decision of the electorate. . . . [W]e decline to act as a superelectorate to weigh the rationality of a method of legislative apportionment adopted by a decisive vote of the people." Id., at 932-933.
And, earlier in its opinion on the merits, the District Court stated:
"With full operation of the one-man, one-vote principle, the Colorado electorate by an overwhelming majority approved a constitutional amendment creating a Senate, the membership of which is not apportioned on a strict population basis. By majority process the voters have said that minority process in the Senate is what they want. A rejection of their choice is a denial of the will of the majority. If the majority becomes dissatisfied with that which it has created, it can make a change at an election in which each vote counts the same as every other vote." Id., at 926-927.
[7] Id., at 933.
[8] Additionally, Judge Doyle correctly stated that "a properly apportioned state legislative body must at least approximate by bona fide attempt the creation of districts substantially related to population." 219 F. Supp., at 941. With respect to the relatively easy availability of the initiative procedure in Colorado, the dissent perceptively pointed out that "it is of little consolation to an individual voter who is being deprived of his rights that he can start a popular movement to change the Constitution. This possible remedy is not merely questionable, it is for practical purposes impossible." Id., at 942. Judge Doyle referred to Amendment No. 7's provisions relating to senatorial apportionment as "the product of a mechanical and arbitrary freezing accomplished by adoption, with slight modification, of the unlawful alignments which had existed in the previous statute." Id., at 943. Discussing the majority's view that geographic and economic considerations were relevant in explaining the disparities from population-based senatorial representation, he discerningly stated that geographic and area factors carry "little weight when considered in the light of modern methods of electronic communication, modern highways, automobiles and airplanes," and, with regard to economic considerations, that "[e]conomic interests are remarkably well represented without special representation," that "[i]t is dangerous to build into a political system a favored position for a segment of the population of the state," that "[t]here exists no practical method of ridding ourselves of them," and that, "long after the institutions pass, the built-in advantage remains even though it is at last only a vestige of the dead past." Ibid.
[9] Admittedly, the Colorado Legislature has never complied with the state constitutional provision requiring the conducting of a decennial state census in 1885 and every 10 years thereafter, and of course has never reapportioned seats in the legislature based upon such a census. Under Amendment No. 7, sole reliance is placed on the federal census, and there is no longer any requirement for the conducting of a decennial state census.

In its initial opinion, the District Court stated that there had been only a "modicum of apportionment, either real or purported," as well as "several abortive attempts," since Colorado first achieved statehood. However, in its later opinion on the merits, the court below viewed the situation rather differently, and stated that "[a]pportionment of the Colorado legislature has not remained static." As indicated by the District Court, in addition to the reapportionments which were effected, "[i]n 1954 the voters rejected a referred apportionment measure and in 1956 rejected an initiated constitutional amendment proposing the reapportionment of both chambers of the legislature on a straight population basis." 219 F. Supp., at 930.
[10] Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934). See note 24, infra.
[11] 208 F. Supp., at 474, 475.
[12] Amendment No. 7 is set out as Appendix A to the District Court's opinion on the merits, 219 F. Supp., at 933-934, and provides for the repeal of the existing Art. V, งง 45, 46 and 47, and the adoption of "new Sections 45, 46, 47 and 48 of Article V," which are set out verbatim in the Appendix to this opinion.

Additionally, the provisions of proposed Amendment No. 8, rejected by the Colorado electorate, are set out as Appendix B to the District Court's opinion on the merits. 219 F. Supp., at 934-935. See the discussion of Amendment No. 8's provisions in note 4, supra.
[13] In addition to establishing House districts, the legislation enacted by the Colorado General Assembly in early 1963, in implementation of Amendment No. 7's provisions, also divided counties apportioned more than one Senate seat into single-member districts. Amendment No. 7, in contrast to Amendment No. 8, explicitly provided for districting, with respect to both Senate and House seats, in multimember counties. The rejected amendment, on the other hand, made no provision at all for districting within counties given more than one Senate seat, and allowed subdistricting of House seats only upon specific approval of such a plan by a county's voters. Thus, Amendment No. 8 would at least in part have perpetuated the extremely objectionable feature of the existing apportionment scheme, under which legislators in multimember counties were elected at large from the county as a whole.
[14] As stated by the District Court, "Mandatory provisions [of Amendment No. 7] require the revision of representative districts and of senatorial districts within counties apportioned more than one senator after each Federal Census." 219 F. Supp., at 925. Under the provisions of Amendment No. 7, eight counties are given more than one Senate seat, and 14 of the 39 senatorial districts are comprised of more than one county.
[15] Colo. Laws 1963, c. 143, pp. 520-532, referred to as House Bill No. 65.
[16] As stated by the court below, "The Colorado legislature met in January, 1963, and passed a statute, H. B. No. 65, implementing Amendment No. 7. No question is raised concerning the implementing legislation." 219 F. Supp., at 924-925. Again the District Court stated: "The cases now before the court do not present the issues as they existed prior to the apportionment made by Amendment No. 7. . . . [T]he then-existing disparities in each chamber were severe, the defendants presented no evidence to sustain the rationality of the apportionment, and witnesses for the intervenors, while defending the apportionment of the Senate, recognized the malapportionment of the House. The change by Amendment No. 7 was such as to require a trial de novo and we are concerned with the facts as finally presented." Id., at 928.
[17] Appendix C to the District Court's opinion on the merits contains a chart of the senatorial districts created under Amendment No. 7's provisions, showing the population of and the counties included in each. 219 F. Supp., at 935-938.
[18] Included as Appendix D to the District Court's opinion on the merits is a chart showing the ratios of population per senator in each district to the population of the least populous senatorial district, as established by Amendment No. 7 and the implementing statutory provisions dividing counties given more than one Senate seat into separate senatorial districts. 219 F. Supp., at 939.
[19] Appellants have repeatedly asserted that equality of population among districts has been the traditional basis of legislative apportionment in both houses of the Colorado General Assembly. They pointed out that both houses of the territorial legislature established by Congress in the organic act creating the territory of Colorado in 1861 were expressly required to be apportioned on a population basis. And, they contended, the legislative districts established for the apportionment of the 26 Senate and 49 House seats in the first General Assembly after Colorado became a State were virtually all substantially equal in population. Referring to the language of the Colorado Supreme Court in Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934), they urged that no basis other than population has ever been recognized for apportioning representation in either house of the Colorado Legislature. Appellees, on the other hand, have consistently contended that population "ratio" figures have been used in apportioning seats in both houses since 1881, requiring proportionately more population to obtain additional legislative representation. Since the Colorado Supreme Court's statements in Armstrong regarding population as the basis of legislative representation plainly assumed the existence of an underlying population ratio scheme, its language can hardly be read out of context to support the proposition that absolute equality of population among districts has been the historical basis of legislative apportionment in Colorado. For a short discussion of legislative apportionment in Colorado, including the adoption of Amendment No. 7 and the instant litigation, see Note, 35 U. of Colo. L. Rev. 431 (1963).
[20] In 1953 the Colorado General Assembly enacted the legislative apportionment scheme in effect when this litigation was commenced. Prior to 1953, the last effective apportionment of legislative representation by the General Assembly itself was accomplished in 1913. The 1932 measure was an initiated act, adopted by a vote of the Colorado electorate. Although the legislature enacted a statutory plan in 1933, in an attempt to nullify the effect of the 1932 initiated act, that measure was held invalid and unconstitutional, as a matter of state law, by the Colorado Supreme Court. See note 24, infra. And the 1962 adoption of the apportionment scheme contained in proposed constitutional Amendment No. 7 resulted, of course, not from legislative action, but from a vote of the Colorado electorate approving the initiated measure. The 1963 statutory provisions were enacted by the General Assembly simply in order to comply with Amendment No. 7's mandate for legislative implementation.
[21] We do not intimate that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective. Rather, we merely point out that there are certain aspects of electing legislators at large from a county as a whole that might well make the adoption of such a scheme undesirable to many voters residing in multimember counties.
[22] Article V, ง 1, of the Colorado Constitution provides that "the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly . . . ," and further establishes the specific procedures for initiating proposed constitutional amendments or legislation.

Twenty-one States make some provision for popular initiative. Fourteen States provide for the amendment of state constitutional provisions through the process of initiative and referendum. See The Book of the States 1962-1963, 14. Seven States allow the use of popular initiative for the passage of legislation but not constitutional amendments. Both types of initiative and referendum may, of course, be relevant to legislative reapportionment. See Report of Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 57 (1962). In some States the initiative process is ineffective and cumbersome, while in others, such as Colorado, it is a practicable and frequently utilized device.
In addition to the initiative device, Art. V, ง 1, of the Colorado Constitution provides that, upon the timely filing of a petition signed by 5% of the State's voters or at the instance of the legislature, the Colorado electorate reserves the power of voting upon legislative enactments in a statewide referendum at the next general election.
[23] Amendment of the Colorado Constitution can be accomplished, in addition to resort to the initiative and referendum device, through a majority vote of the electorate on an amendment proposed by the General Assembly following a favorable vote thereon "by two-thirds of all the members elected to each house" of the Colorado Legislature, pursuant to Art. XIX, ง 2, of the Colorado Constitution. Additionally, a constitutional convention can be convened, upon the favorable recommendation of two-thirds of the members elected to each house of the General Assembly, if the electorate approves of the calling of such a convention to "revise, alter and amend" the State Constitution, under Art. XIX, ง 1, of the Colorado Constitution. Pursuant to Art. XIX, ง 1, "[t]he number of members of the convention shall be twice that of the senate and they shall be elected in the same manner, at the same places, and in the same districts."
[24] See Armstrong v. Mitten, 95 Colo. 425, 37 P. 2d 757 (1934), where the Colorado Supreme Court held that a 1933 statute, enacted by the legislature to effectively nullify the 1932 initiated act reapportioning legislative representation, was void under the state constitutional provisions. In finding the legislative measure invalid, the Colorado court stated that "redistricting must be done with due regard to the requirement that representation in the general assembly shall be based upon population," and that "[t]he legislative act in question is void because it violates section 45 of article 5 of the Constitution, which requires the reapportionment to be made on the basis of population, as disclosed by the census, and according to ratios to be fixed by law." Stating that "[i]t is clear that ratios, after having been fixed under section 45, . . . cannot be changed until after the next census," the Colorado Supreme Court concluded that "[t]he legislative act attempts to confer upon some districts a representation that is greater, and upon others a representation that is less, than they are entitled to under the Constitution." Id., at 428, 37 P. 2d, at 758.
[25] See note 2, supra.
[26] In re Legislative Reapportionment, 150 Colo. 380, 374 P. 2d 66 (1962). Even so, the Colorado court stated that "it is abundantly clear that this court has jurisdiction . . . ." Id., at 385, 374 P. 2d, at 69. See note 2, supra.
[27] See Maryland Committee for Fair Representation v. Tawes, ante, p. 673, decided also this date, where we discussed the need for considering the apportionment of seats in both houses of a bicameral state legislature in evaluating the constitutionality of a state legislative apportionment scheme, regardless of what matters were raised by the parties and decided by the court below. Consistent with this approach, in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole. Only after an evaluation of an apportionment plan in its totality can a court determine whether there has been sufficient compliance with the requisites of the Equal Protection Clause. Deviations from a strict population basis, so long as rationally justifiable, may be utilized to balance a slight overrepresentation of a particular area in one house with a minor underrepresentation of that area in the other house. But, on the other hand, disparities from population-based representation, though minor, may be cumulative instead of offsetting where the same areas are disadvantaged in both houses of a state legislature, and may therefore render the apportionment scheme at least constitutionally suspect. Of course, the court below can properly take into consideration the present apportionment of seats in the House in determining what steps must be taken in order to achieve a plan of legislative apportionment in Colorado that sufficiently comports with federal constitutional requirements.
[28] See Reynolds v. Sims, ante, p. 576, where we discussed some of the underlying reasons for our conclusion that the Equal Protection Clause requires that seats in both houses of a state legislature must be apportioned substantially on a population basis in order to comport with federal constitutional requisites.
[29] And, as stated by the court in Hall v. St. Helena Parish School Bd., 197 F. Supp. 649, 659 (D. C. E. D. La. 1961), aff'd, 368 U. S. 515, "No plebiscite can legalize an unjust discrimination."
[30] In refuting the majority's reliance on the fact that Amendment No. 7 had been adopted by a vote of the Colorado electorate, Judge Doyle, in dissenting below, stated:

"The protection of constitutional rights is not to be approached either pragmatically or expediently, and though the fact of enactment of a constitutional provision by heavy vote of the electorate produces pause and generates restraint we can not, true to our oath, uphold such legislation in the face of palpable infringement of rights. Thus, state racial legislation would unquestionably enjoy overwhelming electorate approval in certain of our states, yet no one would argue that this factor could compensate for manifest inequality. It is too clear for argument that constitutional law is not a matter of majority vote. Indeed, the entire philosophy of the Fourteenth Amendment teaches that it is personal rights which are to be protected against the will of the majority. The rights which are here asserted are the rights of the individual plaintiffs to have their votes counted equally with those of other voters. . . . [T]o say that a majority of the voters today indicate a desire to be governed by a minority, is to avoid the issue which this court is asked to resolve. It is no answer to say that the approval of the polling place necessarily evidences a rational plan. The plaintiffs have a right to expect that the cause will be determined in relation to the standards of equal protection. Utilization of other or different standards denies them full measure of justice." 219 F. Supp., at 944.
[31] In its opinion on the merits, the District Court stated: "By the admission of states into the Union with constitutions creating bicameral legislatures, membership to which is not apportioned on a population basis, Congress has rejected the principle of equal representation as a constitutional requirement." 219 F. Supp., at 927-928. For the reasons stated in our opinion in Reynolds v. Sims, ante, p. 582, we find this argument unpersuasive as a justification for the deviations from population in the apportionment of seats in the Colorado Senate under the provisions of Amendment No. 7. Also, the court below stated that the disparities from population-based senatorial representation were necessary in order to protect "insular minorities" and to accord recognition to "the state's heterogeneous characteristics." Such rationales are, of course, insufficient to justify the substantial deviations from population in the apportionment of seats in the Colorado Senate under Amendment No. 7, under the views stated in our opinion in Reynolds.
[32] See Reynolds v. Sims, ante, pp. 571-576, discussing and rejecting the applicability of the so-called federal analogy to state legislative apportionment matters. As stated in the dissent below, "It would appear that there is no logical basis for distinguishing between the lower and the upper houseโthat the equal protection clause applies to both since no valid analogy can be drawn between the United States Congress" and state legislatures. 219 F. Supp., at 940-941. Additionally, the apportionment scheme embodied in the provisions of Amendment No. 7 differs significantly from the plan for allocating congressional representation among the States. Although the Colorado House of Representatives is arguably apportioned on a population basis, and therefore resembles the Federal House, senatorial seats are not apportioned to counties or political subdivisions in a manner that at all compares with the allocation of two seats in the Federal Senate to each State.
[33] See Reynolds v. Sims, ante, p. 585.
[*] [This opinion applies also to No. 20, WMCA, Inc., et al. v. Lomenzo, Secretary of State of New York, et al, ante, p. 633.]
[*] The Court says that the choice presented to the electorate was hardly "clear-cut." The short answer to this is that if the voters had desired other choices, they could have accomplished this easily by filing initiative petitions, since in Colorado 8% of the voters can force an election.
[1] See Reynolds v. Sims, ante, pp. 554-555, citing: Ex parte Yarbrough, 110 U. S. 651; United States v. Mosley, 238 U. S. 383; Guinn v. United States, 238 U. S. 347; Lane v. Wilson, 307 U. S. 268; United States v. Classic, 313 U. S. 299; Ex parte Siebold, 100 U. S. 371; United States v. Saylor, 322 U. S. 385; Gomillion v. Lightfoot, 364 U. S. 339; Nixon v. Herndon, 273 U. S. 536; Nixon v. Condon, 286 U. S. 73; Smith v. Allwright, 321 U. S. 649; Terry v. Adams, 345 U. S. 461.
[2] "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . ." Gray v. Sanders, 372 U. S., at 379. The Court carefully emphasized in Gray that the case did not "involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen . . . for the State Legislature . . . ." 372 U. S., at 376.
[3] In Wesberry v. Sanders the Court held that Article I of the Constitution (which ordained that members of the United States Senate shall represent grossly disparate constituencies in terms of numbers, U. S. Const., Art. I, ง 3, cl. 1; see U. S. Const., Amend. XVII) ordained that members of the United States House of Representatives shall represent constituencies as nearly as practicable of equal size in terms of numbers. U. S. Const., Art. I, ง 2.
[4] See Reynolds v. Sims, ante, p. 568.
[5] Id., at 560-561.
[6] Baker v. Carr, 369 U. S. 186, 266, 301 (Frankfurter, J., dissenting).

See also the excellent analysis of the relevant historical materials contained in MR. JUSTICE HARLAN'S dissenting opinion filed this day in these and their companion cases, ante, p. 589.
[7] Reynolds v. Sims, ante, p. 567.
[8] On the basis of the 1960 Census, each Senator from Nevada represents fewer than 150,000 constituents, while each Senator from California represents almost 8,000,000. As will become clear later in this opinion, I do not mean to imply that a state legislative apportionment system modeled precisely upon the Federal Congress would necessarily be constitutionally valid in every State.
[9] It has been the broad consensus of the state and federal courts which, since Baker v. Carr, 369 U. S. 186, have been faced with the basic question involved in these cases, that the rule which the Court announces today has no basis in the Constitution and no root in reason. See, e. g., Sobel v. Adams, 208 F. Supp. 316, 214 F. Supp. 811; Thigpen v. Meyers, 211 F. Supp. 826; Sims v. Frink, 205 F. Supp. 245, 208 F. Supp. 431; W. M. C. A., Inc., v. Simon, 208 F. Supp. 368; Baker v. Carr, 206 F. Supp. 341; Mann v. Davis, 213 F. Supp. 577; Toombs v. Fortson, 205 F. Supp. 248; Davis v. Synhorst, 217 F. Supp. 492; Nolan v. Rhodes, 218 F. Supp. 953; Moss v. Burkhart, 207 F. Supp. 885; Lisco v. Love, 219 F. Supp. 922; Wisconsin v. Zimmerman, 209 F. Supp. 183; Marshall v. Hare, 227 F. Supp. 989; Hearne v. Smylie, 225 F. Supp. 645; Lund v. Mathas, 145 So. 2d 871 (Fla.); Caesar v. Williams, 84 Idaho 254, 371 P. 2d 241; Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 180 A. 2d 656, 182 A. 2d 877, 229 Md. 406, 184 A. 2d 715; Levitt v. Maynard, 104 N. H. 243, 182 A. 2d 897; Jackman v. Bodine, 78 N. J. Super. 414, 188 A. 2d 642; Sweeney v. Notte, ___ R. I. ___, 183 A. 2d 296; Mikell v. Rousseau, 123 Vt. 139, 183 A. 2d 817.

The writings of scholars and commentators have reflected the same view. See, e. g., De Grazia, Apportionment and Representative Government; Neal, Baker v. Carr: Politics in Search of Law, 1962 Supreme Court Review 252; Dixon, Legislative Apportionment and the Federal Constitution, 27 Law & Contemp. Prob. 329; Dixon, Apportionment Standards and Judicial Power, 38 Notre Dame Law. 367; Israel, On Charting a Course Through the Mathematical Quagmire: The Future of Baker v. Carr, 61 Mich. L. Rev. 107; Israel, Nonpopulation Factors Relevant to an Acceptable Standard of Apportionment, 38 Notre Dame Law. 499; Lucas, Legislative Apportionment and Representative Government: The Meaning of Baker v. Carr, 61 Mich. L. Rev. 711; Friedelbaum, Baker v. Carr: The New Doctrine of Judicial Intervention and its Implications for American Federalism, 29 U. of Chi. L. Rev. 673; Bickel, The Durability of Colegrove v. Green, 72 Yale L. J. 39; McCloskey, The Reapportionment Case, 76 Harv. L. Rev. 54; Freund, New Vistas in Constitutional Law, 112 U. Pa. L. Rev. 631, 639; Comment, Baker v. Carr and Legislative Apportionments: A Problem of Standards, 72 Yale L. J. 968.
[10] See, e. g., De Grazia, Apportionment and Representative Government, pp. 19-63; Ross, Elections and Electors, pp. 21-127; Lakeman and Lambert, Voting in Democracies, pp. 19-37, 149-156; Hogan, Election and Representation; Dahl, A Preface to Democratic Theory, pp. 63-84, 124-151.
[11] See, e. g., Sandalow, The Limits of Municipal Power Under Home Rule: A Role for the Courts, 48 Minn. L. Rev. 643; Klemme, The Powers of Home Rule Cities in Colorado, 36 U. Colo. L. Rev. 321.
[12] Even with legislative districts of exactly equal voter population, 26% of the electorate (a bare majority of the voters in a bare majority of the districts) can, as a matter of the kind of theoretical mathematics embraced by the Court, elect a majority of the legislature under our simple majority electoral system. Thus, the Court's constitutional rule permits minority rule.

Students of the mechanics of voting systems tell us that if all that matters is that votes count equally, the best vote-counting electoral system is proportional representation in state-wide elections. See, e. g., Lakeman and Lambert, supra, n. 10. It is just because electoral systems are intended to serve functions other than satisfying mathematical theories, however, that the system of proportional representation has not been widely adopted. Ibid.
[13] In Baker v. Carr, 369 U. S. 186, it was alleged that a substantial numerical majority had an effective voice in neither legislative house of Tennessee. Failure to reapportion for 60 years in flagrant violation of the Tennessee Constitution and in the face of intervening population growth and movement had created enormous disparities among legislative districtsโeven among districts seemingly identical in compositionโwhich, it was alleged, perpetuated minority rule and could not be justified on any rational basis. It was further alleged that all other means of modifying the apportionment had proven futile, and that the Tennessee legislators had such a vested interest in maintaining the status quo that reapportionment by the legislature was not a practical possibility. See generally, the concurring opinion of MR. JUSTICE CLARK, 369 U. S., at 251.
[14] The theoretical figure is arrived at by placing the legislative districts for each house in rank order of population, and by counting down the smallest population end of the list a sufficient distance to accumulate the minimum population which could elect a majority of the house in question. It is a meaningless abstraction as applied to a multimembered body because the factors of political party alignment and interest representation make such theoretical bloc voting a practical impossibility. For example, 31,000,000 people in the 26 least populous States representing only 17% of United States population have 52% of the Senators in the United States Senate. But no one contends that this bloc controls the Senate's legislative process.
[15] Within the last 12 years, the people of Michigan, California, Washington, and Nebraska (unicameral legislature) have expressed their will in popular referenda in favor of apportionment plans departing from the Court's rule. See Dixon, 38 Notre Dame Law., supra, at 383-385.
[16] Brief for the United States as amicus curiae on reargument, No. 6, 1961 Term, pp. 29-30.

The Solicitor General, appearing as amicus in the present cases, declined to urge this Court to adopt the rule of per capita equality in both houses, stating that "[s]uch an interpretation would press the Equal Protection Clause to an extreme, as applied to State legislative apportionment, would require radical changes in three-quarters of the State governments, and would eliminate the opportunities for local variation." Brief for the United States as amicus curiae, No. 508, 1963 Term, p. 32.
[17] See Dixon, 38 Notre Dame Law., supra, at 399.
[18] The following excerpts from the brief of the Attorney General of New York in this case are instructive:

"For example, state aid is administered by the counties in the following areas: educational extension work (N. Y. Education Law งง 1104, 1113), community colleges (N. Y. Education Law งง 6301, 6302, 6304), assistance to physically handicapped children (N. Y. Education Law ง 4403), social welfare such as medical and other aid for the aged, the blind, dependent children, the disabled, and other needy persons (N. Y. Social Welfare Law งง 153, 154, 257, 409), public health (N. Y. Public Health Law งง 608, 620, 636, 650, 660), mental health (N. Y. Mental Hygiene Law, Art. 8-A, ง 191-a), probation work (N. Y. Correction Law ง 14-a), highway construction, improvement and maintenance (N. Y. Highway Law งง 12, 112, 112-a, 279), conservation (N. Y. County Law งง 219, 299-w, N. Y. Conservation Law งง 205, 879), and civil defense preparations (State Defense Emergency Act งง 23-b, 25-a).
"County governments, are, of course, far more than instrumentalities for the administration of state aid. They have extensive powers to adopt, amend or repeal local laws affecting the county (N. Y. County Law งง 301-309), and also play a vital part in the enactment of state laws which affect only a particular county or counties (See N. Y. Constitution, Art. IX, งง 1, 2). The enactment in 1959 of a new County Charter Law (N. Y. County Law, Art. 6-A), providing opportunity for the fundamental reorganization of county governments by county residents, has given the counties an even greater role to play in the social, economic and political life of modern New York." Brief for appellees Secretary of State and Attorney General, No. 20, 1963 Term, pp. 42-43.